ATLANTIC COAST DEMOLITION
& RECYCLING, INC., et al.,
Plaintiffs,

v.

BOARD OF CHOSEN FREEHOLDERS
OF ATLANTIC COUNTY, et al.,
Defendants.

Civ. A. Nos. 93–2669 (JEI), 94–3244 (JEI).

United States District Court,
D. New Jersey.

June 9, 1995.

Mesirov Gelman Jaffe Cramer & Jamieson by Mitchell Feigenbaum, Haddonfield, NJ, for plaintiff Atlantic Coast Demolition & Recycling, Inc.

Steptoe & Johnson by William T. Hassler, Washington, DC, for plaintiffs Nat. Solid Waste Management Ass'n, Waste Management Ass'n of New Jersey, Bret Schundler, the Mayor of the City of Jersey City, NJ, John Rooney, the Mayor of the Borough of Northvale, NJ, the City of Passaic, NJ, and the City of Patterson, NJ.

Deborah T. Poritz, Atty. Gen. by Gail M. Lambert, Stefanie A. Brand, Deputy Atty. Gen., Dept. of Law and Public Safety, Div. of Law, Newark, NJ, for defendant Scott A. Weiner.

DeCotiis, Fitzpatrick & Gluck by J.S. Lee Cohen, Hackensack, NJ, for intervenor-defendants Hudson County Improvement Authority, Mercer County Improvement Authority, Essex County Utilities Authority, and Passaic County Utilities Authority.

Wolff & Samson, P.C. by David Samson, Roseland, NJ, for intervenor-defendant Camden County Energy Recovery Associates, L.P.

Sinisi, Van Dam & Sproviero by Stephen P. Sinisi, Paramus, NJ, for defendant Bergen County Utilities Authority.

## OPINION

IRENAS, District Judge:

Plaintiffs in these consolidated cases have brought challenges under the dormant Commerce Clause [1] to portions of the New Jersey Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –207 ("SWMA"), the Solid Waste Utility Control Act ("SWUCA"), and regulations promulgated thereunder, *N.J.A.C.* 7:26, a group of statutes and regulations that the Court shall refer to collectively as the "waste flow regulations." Certain plaintiffs have now moved for a preliminary injunction.

The Court finds that plaintiff Atlantic Coast Demolition and Recycling, Inc. ("Atlantic Coast") has shown a likelihood of success on the merits and irreparable injury, and that on the basis of the current record these factors outweigh the irreparable injury that the narrow preliminary relief requested could cause to defendants and the public. However, because of the Court's concerns that the requested relief might cause serious irreparable harm to the defendants and the public, and because of important issues of comity, the Court will condition the grant of the requested relief upon the consideration of further submissions by defendants regarding potential alternatives to the current regulations and the impact of these regulations on defendants and the public.

As to plaintiffs National Solid Waste Management Association ("NSWMA") and Waste Management Association of New Jersey ("WMANJ," and along with NSWMA, the "association plaintiffs"), the Court finds that their likelihood of success and the irreparable injury that they suffer due to the waste flow regulations are outweighed by the irreparable harm that their request for preliminary relief would cause defendants and the public. The motion of the association plaintiffs will therefore be denied. Finally, as to plaintiffs Bret Schundler, the Mayor of the City of Jersey City, New Jersey, John Rooney, the Mayor of the Borough of Northvale, New Jersey, the City of Passaic, New Jersey, and the City of Patterson, New Jersey (collectively the "municipal plaintiffs"), the Court finds that these plaintiffs have no claim against defendants and they will be dismissed from the case.

## PROCEDURAL HISTORY

Plaintiffs in this case come from two consolidated cases, *Atlantic Coast Demolition & Recycling, Inc., v. Board of Chosen Freeholders, et al.,* Civ. No. 93–2669 (JEI), and *C & A Carbone, et al. v. Shinn, et al.,* Civ. No. 94–

---

1. U.S. Const. art. I, § 8, cl. 3, provides: "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Although the Commerce Clause "thus speaks in terms of powers bestowed upon Congress," courts have "long recognized that it also limits the power of States to erect barriers against interstate trade." *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 48 F.3d 701, 710 (3d Cir.1995) (internal quotations omitted).

3244 (JEI). The *Atlantic Coast* case was filed on June 23, 1993, and Atlantic Coast, the sole plaintiff in that matter, moved for a temporary restraining order. On September 2, 1993 after a period of intensive discovery, the Court held a hearing, and on September 8, 1993, rendered its oral findings of fact and conclusions of law. Following the Third Circuit's decision in *J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection*, 857 F.2d 913 (3d Cir.1988), the Court concluded that the waste flow regulations should be analyzed under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and that the state interest served by the waste flow regulations outweighed any burden on interstate commerce. The Court therefore denied Atlantic Coast's application for a temporary restraining order, and on February 28, 1994, with the consent of the parties, entered final judgment in defendants' favor on the basis of its prior findings of fact and conclusions of law.

Atlantic Coast appealed. In an opinion filed February 16, 1995, the Third Circuit reversed this Court's decision and remanded the case for further proceedings. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, 48 F.3d 701 (3d Cir. 1995). The court concluded that in light of the Supreme Court's recent decision in *C & A Carbone, Inc. v. Clarkstown*, — U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), which was decided after this Court's entry of final judgment, New Jersey's waste flow regulations discriminate against interstate commerce and are subject to heightened scrutiny under the dormant Commerce Clause rather than the less strict *Pike* balancing test. 48 F.3d at 713. However, the court also held that it would leave the district court to determine whether the regulations could be upheld under strict scrutiny. *Id.* at 718. In doing so, the court specifically stated that "Atlantic Coast is free at any time to apply again for *pendente lite* relief." *Id.*

On April 12, 1995, this Court granted the motions of Hudson County Improvement Authority, Mercer County Improvement Authority, Essex County Utilities Authority, Passaic County Utilities Authority (the "county authorities") and Camden County Energy Recovery Associates, L.P., ("CCERA") to intervene as defendants. On that date, Atlantic Coast filed the instant request for *pendente lite* relief.

The *C & A Carbone* case was filed on July 11, 1994, and assigned to the Newark vicinage. The case raises essentially the same challenges to the New Jersey waste flow regulations as those brought in *Atlantic Coast*. The case was stayed pending the Third Circuit's decision in *Atlantic Coast*, and when that case was remanded, *C & A Carbone* was transferred to this Court. On April 12, 1995, this Court granted defendants' motion to consolidate the case with *Atlantic Coast*. On April 17, 1995, the association plaintiffs and the municipal plaintiffs in *C & A Carbone* moved for *pendente lite* relief.

Since the filing of the preliminary injunction motions, the parties have engaged in extensive discovery that delayed the preliminary injunction hearing. The Court set June 6, 1995, as the date for the hearing, and in accordance with the Third Circuit' opinion, indicated that it would exercise its discretion "to reopen the record for supplementary evidence." 48 F.3d at 718 n. 21. The parties, however, elected not to offer further oral testimony, but rather elected to proceed on the basis of the previous record before this Court and the briefs, exhibits, and affidavits submitted in connection with the preliminary injunction motions and defendants' responses thereto. The Court held oral argument on the motions on June 6, 1995, and now renders its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

The Court hereby adopts its Findings of Fact Numbers One through Twenty–Six of its oral opinion rendered September 8, 1993. These findings relate primarily to the waste disposal problems in New Jersey, the flow control regulations, and Atlantic Coast's efforts to be included in the flow control scheme. The Third Circuit specifically upheld these findings. *Atlantic Coast*, 48 F.3d at 704 n. 2. The Court also adopts the Third Circuit's detailed discussion of the New Jer-

sey solid waste management system and Atlantic Coast's activities. 48 F.3d at 704–09. The following additional findings of fact are based on the exhibits and affidavits submitted by the parties in conjunction with the preliminary injunction motions.

1. Between February and September of 1993, Atlantic Coast received approximately 15,800 tons of construction and demolition ("C & D") waste from New Jersey, resulting in approximately $90,000 in monthly revenue. (Dengler Decl. at ¶ 3.) From 1993 to February 1995, when Atlantic Coast was not receiving New Jersey waste, its average monthly net loss increased from $27,237 to $80,607. (Durkin Decl. at ¶¶ 2–4.) Atlantic Coast's exclusion from New Jersey has also resulted in many of its New Jersey waste haulers refusing to pay outstanding bills, because Atlantic Coast could no longer process this waste and therefore had little leverage to collect this money. Atlantic Coast now shows $233,000 in bad debt on total New Jersey sales of $630,000, for a bad debt ratio of approximately 27% as compared to an overall bad debt ratio of 6%. (Id. at ¶ 6.)

2. Despite Atlantic Coast's poor financial performance, its parent corporation, United Waste Systems, Inc., has continued to finance Atlantic Coast, primarily in the hope that Atlantic Coast's entry into the New Jersey market will increase its profitability. (Sheehan Decl. at ¶¶ 9–11.)[2] On the other hand, if New Jersey's waste flow scheme is finally declared constitutional, United Waste intends to either shut down or sell the Atlantic Coast facility (Id. at ¶¶ 12–13.) However, United Waste will continue to support Atlantic Coast pending the final resolution of this case.

3. NSWMA and WMANJ are both trade associations made up of private companies in the solid waste disposal industry. NSWMA members include transporters of solid waste, operators of solid waste treatment, storage, and disposal facilities, recyclers of solid waste, and manufacturers and distributors of solid waste management equipment. WMANJ members include New Jersey collection companies, waste transporters, transfer stations, materials recovery facilities, and recycling facilities. Associate members of WMANJ include New Jersey vehicle and equipment providers, maintenance companies, consultants, and various professionals such insurance brokers.

4. Out of state members of the NSWMA who process solid waste are affected by the New Jersey waste flow regulations in primarily the same way as Atlantic Coast. They are either effectively excluded from the New Jersey market or, if they are included in a district plan and obtain the requisite state and local approvals, may deal in New Jersey waste under the now-codified "Pereira policy." N.J.A.C. 7:26–6.9 and 26–2B.9. Nonetheless, the processor must still return any residual waste to the disposal facility designated by that district plan or pay the tipping fee[3] that the facility would charge, see id., a fee that often exceeds what the processor would pay at an out of state facility. Furthermore, out of state NSWMA disposal facilities are precluded from accepting New Jersey waste unless they are accepted into a district plan, a contingency that is unlikely unless the district is unable to locate sufficient disposal capacity within that district or another district. See 48 F.3d at 707–08. New Jersey NSWMA and WMANJ members are primarily affected by the waste flow regulations because they require them to dispose of solid waste at designated New Jersey solid waste facilities and pay the requisite tipping fee rather than disposing of the waste at the facility of their choice, either within or outside the state.

5. Jersey City, Northvale, Passaic, and Patterson are all New Jersey municipalities

---

**2.** In an attempt to show that Atlantic Coast's financial problems are not as severe as it states, defendants have offered evidence establishing that United Waste has continued to support Atlantic Coast. (See CCERA Brief at Exs. "A"–"E".) The Court accepts this fact, but nonetheless finds that Atlantic Coast is losing money at a quicker rate than it was when it could do business in New Jersey without returning the residual waste to a designated New Jersey facility.

**3.** "Tipping fees are the rates that a disposal facility or transfer station charges the hauler who deposits waste at the facility." Atlantic Coast, 48 F.3d at 707 n. 10 (citing J. Filiberto, 857 F.2d at 916 (3d Cir.1988)).

in the northern part of the state. Plaintiff Bret Schundler is the Mayor of Jersey City and plaintiff John Rooney is the Mayor of Northvale, although both mayors are named as plaintiffs simply in their official capacities as mayors of the municipalities and not as taxpayers or in any other capacity that would make their interest in the case any different from that of the municipality that they represent. All of the municipal plaintiffs are required to dispose of waste generated in the municipality through the waste flow plan devised by the district in which that municipality is located. If the municipal plaintiffs were not restrained by the waste flow regulations, they could, at least in the immediate future, obtain municipal waste disposal services at a lower cost than is currently available. (Guerra Aff. at ¶ 12; Dopirak Aff. at ¶ 12; Czech Aff. at ¶ 11; Rooney Aff. at ¶ 11.)

6. Intervenor-defendants Passaic County Utilities Authority, Essex County Utilities Authority, Hudson County Improvement Authority, and Mercer County Improvement Authority are each Solid Waste Management Districts established by the 1975 amendments to the SWMA. *N.J.S.A.* 13:1E–20. Each authority promulgates a district plan, which consists of some combination of designated disposal facilities, transfer stations, and contracts for the disposal and hauling of waste. *See, e.g., N.J.A.C.* 7:26–6. Not all solid waste, however, is ultimately disposed of within the boundaries of the state of New Jersey. For example, much of the solid waste handled by the Mercer County Improvement Authority is ultimately disposed of in the G.R.O.W.S. landfill in Bucks County, Pennsylvania. *N.J.A.C.* 7:26–6.5(1). Nonetheless, this waste still passes through the Mercer County Transfer Station, *id.*, which charges a tipping fee that is generally conceded to be above market rate.

7. If the waste flow regulations are disrupted, the revenues of the county authorities would be similarly disrupted. This effect would be caused by a loss of business to out of state processing and disposal facilities or by lower rates charged to compete with these facilities. (Lambert Cert. at ¶ 12; Lund Cert. at ¶ 30; Ross Aff. at ¶ 18; Vaccarino Cert. at ¶ 15.) Furthermore, in reliance upon the steady revenue generated by the waste flow regulations, the county authorities have incurred over one billion dollars in debt in the form of revenue bonds and contractual obligations, much of which is guaranteed by the respective counties, other public authorities such as the Port Authority of New York and New Jersey, or financial institutions. Wholesale disruption of the waste flow regulations could impair the ability of the county authorities to finance this debt and could ultimately force them into default on the bonds or contractual obligations. (Whelan Aff. at ¶¶ 4–5.)

8. Intervenor-defendant CCERA owns and operates the South Camden Resource Recovery Facility ("SCRRF"), an incinerator that acts as the disposal facility for much of the solid waste generated in Camden County, New Jersey. *See N.J.A.C.* 7:26–6.5(d). Because the disposal of solid waste at the SCRRF is generally more expensive than at an out of state disposal facility, SCRRF would not operate at full capacity if the waste flow regulations were enjoined, with a concomitant loss of income by CCERA. (Karpenski Decl. at ¶ 12.)

9. New Jersey generates approximately seven million tons of solid waste per annum, or approximately 24,500 tons per day. (Sondermeyer Aff. at ¶ 2.) 75% of this waste is type 10, or residential and commercial municipal waste, 20% is type 13, or bulky and construction waste, and the remaining 5% is made up of other types of waste.

10. New Jersey currently requires all waste transported out of the state to pass through a transfer station. (*Id.* at ¶ 5.) Currently, New Jersey has the transfer station capacity to inspect only about 14% of the solid waste generated in the state. (*Id.* at ¶ 6.) Therefore, New Jersey could not maintain this policy if the waste flow regulations were immediately dismantled. The unregulated transportation of waste out of the state would present environmental hazards. (*Id.* at 7.)

11. Approximately 469 solid waste collectors currently hold certificates to do business in New Jersey. (*Id.* at 9.) These haulers are required by state statute to file a tariff with the state. *See N.J.S.A.* 48:13A–7.1 *et*

*seq.* While the rates charged by the waste haulers are now relatively stable due to the constraints of the waste flow system, dismantling the system would change the operating expenses of these haulers and require each hauler to file a new tariff each time it changed its rate. (*Id.* at ¶¶ 9–10.)

12. The waste management plan envisioned under the SWMA depends heavily upon the steady revenue flow to each county authority described above. (Gates Cert. at ¶ 1.) Therefore, dismantling the waste flow regulations and allowing out-of-state competition could suddenly disrupt the entire scheme of waste flow management in New Jersey. (*Id.* at ¶ 8.) In the long term, this disruption will discourage (a) the creation of new waste disposal facilities and (b) the maintenance and expansion of existing facilities unless a new comprehensive regulatory scheme is implemented. On the basis of the current record, the Court cannot determine if such a system is feasible in light of Commerce Clause restrictions.

## CONCLUSIONS OF LAW

### I. *Preliminary Injunction Standard*

■ In order to obtain a preliminary injunction, the moving party must show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted...." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (internal quotations omitted). A failure to show either of these elements will result in the denial of the injunction. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989). Where relevant, the court should also take into account (3) the possibility of harm to other persons from the grant or denial of the injunction, and (4) the public interest. *Id.; Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc.*, 630 F.2d 120, 126 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The grant or denial of a preliminary injunction lies within "the sound discretion of the district judge, who must balance all of these factors in making a decision." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982). All four factors should favor preliminary relief before the injunction is granted. *American Tel. & Tel. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994) (*"AT & T"*), *cert. denied*, — U.S. —, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir.1992).

### II. *Analysis*

#### A. *Atlantic Coast*

#### 1) *Likelihood of Success on the Merits*

■ In light of the Third Circuit's decision, the Court finds that Atlantic Coast has made a *prima facie* showing of likelihood of success on the merits. Under the "heightened scrutiny" test adopted by the Third Circuit, "'the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.'" 48 F.3d at 717 (quoting *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986)). The Supreme Court recently phrased this test as requiring the state to prove "that it has no other means to advance a legitimate local interest." *C & A Carbone*, — U.S. at —, 114 S.Ct. at 1683. For the purposes of this motion, the Court finds that defendants have not "accomplished the much more onerous task of demonstrating that there is no alternative to its waste flow regulations that would accomplish its legitimate objectives." *Atlantic Coast*, 48 F.3d at 718.

While defendants devote substantial portions of their briefs to the likelihood of success on the merits, their arguments do not seriously contradict the assertion that, at this stage of the litigation, Atlantic Coast is likely to succeed on its claim. First, defendants argue that if Atlantic Coast's case were certain to succeed, the Third Circuit would not have remanded the case for further proceedings, but rather would have directed this Court to enter judgment in favor of Atlantic Coast. While this argument possesses a certain simplistic appeal, it does not recognize that a plaintiff seeking injunctive relief need show only a *likelihood* of success on the merits, not a *certainty* of success. Indeed, the Third Circuit noted that while the Court

had denied Atlantic Coast's previous application for preliminary relief, Atlantic Coast's likelihood of success was "materially different" under the more stringent heightened scrutiny test. 48 F.3d at 718.

Defendants also point to a number of arguably legitimate state interests served by the waste flow regulations, such as avoiding out-of-state waste disposal liability, financing, inspecting solid waste, maintaining sufficient disposal capacity, waste management planning, and maintaining incinerators. (County Authorities' Brief at 46–49.) However, while invited to reopen the record, defendants have not offered any expert or other testimony to show that no feasible nondiscriminatory alternatives could adequately serve these goals. Instead, defendants simply state why systems adopted by other states would not work in New Jersey, (State's Brief at 33–39), and that it is not clear that feasible alternatives exist to the current scheme. (County Authorities' Brief at 50.) These arguments do not meet the "onerous" burden of showing that even the relatively simple (some would say simplistic) alternatives suggested by the Supreme Court in *C & A Carbone,* the "unobstructed flow of interstate commerce" and "general taxes or municipal bonds," would be infeasible alternatives to the current discriminatory regime.

Finally, defendants note that the United States Senate has recently passed a bill that would retroactively authorize municipal waste flow regulations, S. 534, 104th Cong., 1st Sess. (May 16, 1995), and that a similar bill was recently reported to the House floor by the Commerce Committee, House of Rep. Comm. on Commerce, 104th Cong., 1st Sess., *A Bill to Amend the Solid Waste Disposal Act* (May 16, 1995.) Because Congress may affirmatively authorize states to regulate interstate commerce, *see Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 392 (3d Cir.

1987), passage of this bill would resolve the controversy over the New Jersey waste flow regulations. Nonetheless, congressional bills, even those overwhelmingly passed by one house of Congress,[4] often stall in the legislative process, and defendants have not cited the Court to any authority that it should abstain from granting preliminary injunctive relief based on the contingency that Congress might enact the law at issue.[5] Therefore, Atlantic Coast has made a strong showing of likelihood of success on the merits.

### 2) *Irreparable Harm*

Plaintiffs have cited authorities stating that constitutional violations in general, and dormant Commerce Clause violations in particular, constitute irreparable injury warranting injunctive relief. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 at 440 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (1973); *Allen v. Minnesota,* 867 F.Supp. 853, 859 (D.Minn.1994) (violation of Commerce and Contracts Clause constitutes irreparable harm); *Citicorp Servs., Inc. v. Gillespie,* 712 F.Supp. 749, 753–54 (N.D.Cal. 1989) (Commerce Clause violation "give[s] rise to a presumption of irreparable harm"); *Government Suppliers Consolidating Servs., Inc. v. Bayh,* 734 F.Supp. 853 (S.D.Ind.1990) (waste flow regulation which violates Commerce Clause causes irreparable injury regardless of showing of economic harm); *C & A Carbone, Inc. v. Town of Clarkstown,* 770 F.Supp. 848, 854 (S.D.N.Y.1991) (local waste flow regulation that violates Commerce Clause "unquestionably constitutes irreparable injury."). Defendants, on the other hand, argue that unlike "personal" constitutional rights such as the First Amendment free-

---

**4.** The Senate passed S. 534 by a vote of 94–6. 141 Cong.Rec. S6722 (daily ed. May 16, 1995.)

**5.** At oral argument, the state cited *Black United Fund of New Jersey v. Kean,* 763 F.Supp. 156 (3d Cir.1985), for the proposition that the pending congressional enactment restricts this Court's discretion to grant or deny the preliminary injunction. However, the issue in *Black United Fund* was "the effect of a change of law which

occurs after the entry of an order in the trial court but before appellate review." 763 F.2d at 160. Thus, while *Black United Fund* does stand for the proposition that enactment of the bill would moot any injunctive relief granted by this Court, it does not indicate that the Court should refrain from acting due to the pending legislation.

doms at issue in *Elrod v. Burns,* violations of "structural" constitutional rights such as the dormant Commerce Clause do not constitute *per se* irreparable harm. *See American Petroleum Inst. v. Jorling,* 710 F.Supp. 421, 431 (N.D.N.Y.1989); *Norfolk Southern Corp. v. Oberly,* 594 F.Supp. 514, 522 (D.Del.1984); *Grand Central Sanitation, Inc. v. City of Bethlehem,* No. 94–5928, mem. op. at 4–5, 1994 WL 613674 (E.D.Pa. Nov. 2, 1994).

■ The proper course lies between those charted by the respective parties. The Court holds that a violation of rights under the dormant Commerce Clause constitutes the "irreparable harm" necessary for a plaintiff to avoid denial of a preliminary injunction on this ground only. In a case such as this, however, where the Court must carefully weigh the moving party's likelihood of success on the merits and degree of irreparable harm against the irreparable harm that preliminary relief may cause to the opposing parties and the public, the violation of dormant Commerce Clause rights unaccompanied by other irreparable harm does not weigh heavily on the moving party's side of the scale. *See Constructors Ass'n of W. Penna. v. Kreps,* 573 F.2d 811, 820 n. 33 (3d Cir.1978) ("unlike First Amendment rights whose deprivation even from minimal periods of time constitutes irreparable injury [citing *Elrod* ], a denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation."). *See also C & A Carbone,* 770 F.Supp. at 854 (finding irreparable injury in violation of dormant Commerce Clause rights along with economic harm that would be impossible to measure); *Government Suppliers,* 734 F.Supp. at 864 (same).

Atlantic Coast argues that in addition to the deprivation of its constitutional rights, it will also be forced out of business if the New Jersey waste flow regulations remain in force. This circuit has recognized that the destruction of a business may constitute irreparable harm warranting injunctive relief.

*See Instant Air Freight,* 882 F.2d at 802. Atlantic Coast has shown that it is losing money, and doing so more quickly than it was when it accepted New Jersey waste. Nonetheless, this testimony does not show that Atlantic Coast will go out of business if it is not granted relief *pendente lite.* If anything, this proposition is contradicted by Sheehan's statement that United Waste would stop supporting Atlantic Coast *if* the waste flow regulations were upheld. This statement implies that United Waste *will* continue to support Atlantic Coast pending a final resolution of this case. Therefore, the Court finds that Atlantic Coast has not made the necessary clear showing that denial of the preliminary injunction will force it out of business. *See id.* at 801–03.

■ Nonetheless, Atlantic Coast has suffered a high degree of monetary damage over an extended period of time from a waste flow regulation that, in light of the Third Circuit's decision and the current state of the record, is likely to be unconstitutional. Furthermore, this damage was inflicted by the State of New Jersey and its agencies, all of which are immune from money damages in this Court under the Eleventh Amendment. Where the Eleventh Amendment bars recovery of monetary damages from state entities, legal remedies are inadequate and the plaintiff has shown the irreparable harm necessary for injunctive relief. *Temple Univ. v. White,* 941 F.2d 201, 215 (3d Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). The Court finds that Atlantic Coast has suffered irreparable harm in the money damages it has suffered that it cannot recover from the state entities.[6]

### 3) *Harm to Defendants and the Public*

Defendants have shown that enjoining the waste flow regulations may reduce the value or cause default of the county authorities' publicly issued bonds, cause monetary damage to entities such as CCERA that own

---

**6.** Atlantic Coast has asserted that it may recover money damages from the county authorities. While the county authorities do not enjoy Eleventh Amendment immunity, whether they may be held liable in damages for their participation in a mandatory state program is an open and difficult

question. *See, e.g.,* 1 M. Schwartz & J. Kirklin, *Section 1983 Litigation* § 7.7 at 360–62 (1991). While the Court need not resolve the issue at this time, the likelihood that Atlantic Coast will be unable to recover damages from any defendant makes its harm irreparable.

waste disposal facilities within the waste flow regulation scheme, cause administrative inconvenience for the state, and potentially undermine the goals of New Jersey's comprehensive waste flow plan. They also argue that the current scheme came about as a solution to years of difficulty in waste management in New Jersey, that the scheme was initially given approval by courts such as the Third Circuit in *J. Filiberto,* and that the program has largely been successful. Furthermore, disturbing the highly intertwined network of waste haulers, transfer stations, and disposal facilities (some of which are financed by tax-exempt bonds) created by the waste flow regulations would result in the disruption of not only the expectations but also the contractual rights and obligations of many participants in district plans who are not parties to this litigation, including purchasers of municipal bonds and any entities or institutions having credit enhancement obligations on that debt. Finally, New Jersey is not currently prepared to handle its solid waste flow stream without waste flow regulations, and disbanding the regulations may present significant environmental concerns.

However, defendants have not shown that the narrow relief sought by Atlantic Coast will cause this damage. Atlantic Coast processes only C & D waste, which the waste flow regulations classify as type 13 waste. While type 13 waste makes up approximately 20% of New Jersey's solid waste, it is defined as almost all "bulky" waste, including:

> Large items of waste material, such as, appliances, furniture, whole trees, branches, tree trunks and stumps. Also included are waste building materials and rubble resulting from construction, remodeling, repair and demolition operations on houses, commercial buildings, pavements and other structures. Discarded automobiles,

trucks and trailers and large vehicle parts, and tires are included under this category. *N.J.A.C.* 7:26–2.13(g)(iii).

While defendants have shown that enjoining a large segment of the waste flow regulations will cause them harm, and that type 13 waste makes up 20% of New Jersey's solid waste stream, the current record shows neither the portion of the 20% that is made up of the type of C & D waste that Atlantic Coast processes nor the effect that an injunction limited to this material would have on defendants and the public. In its previous opinion, the Court found that Atlantic Coast's permit from the Pennsylvania Department of Environmental Resources ("PaDER") allowed it to process waste including "uncontaminated rock, uncontaminated ferrous metals, wood, recyclables[,] uncontaminated soil, and non-marketable construction and demolition materials." (Sept. 8, 1993, Tr. at 14.) There is no evidence in the record from which the Court can adduce the extent to which the 20% of waste generally classified as type 13 waste is made up of the C & D waste specified in Atlantic Coast's permit.

In the absence of a showing that the relief requested by Atlantic Coast will dismantle a significant portion of the existing waste flow scheme, defendants' warnings about the harm that preliminary relief will cause them are unconvincing. Although defendants predict a significant disruption of revenues, significant administrative burdens, and a significant increase in the regulation of waste heading out of state, the current record simply does not allow the Court to quantify the burdens which would be imposed by an injunction generally affecting waste of the type hauled by Atlantic Coast.[7]

Atlantic Coast's proposed injunction will affect less than 20% of the waste generated in New Jersey, and therefore will not frus-

---

7. The Court recognizes that a party seeking a preliminary injunction bears the burden of showing that the irreparable harm it will suffer outweighs both the irreparable harm that the defendants will incur if the injunction is granted as well as the harm that the public will suffer as a result of the injunction. *AT & T,* 42 F.3d at 1427. However, defendants in this case have not met even the minimal burden of producing evidence showing the degree to which the proposed injunction would harm them, information that is uniquely within defendants' control. Because the current record does not allow the Court to find that defendants will suffer significant irreparable harm as a result of the proposed injunction, the Court finds that Atlantic Coast has met its burden of proving that the irreparable harm it will suffer outweighs any that defendants might incur.

trate the goals of programs such as the SWMA. The injunction will affect only those involved with C & D waste, and will not cause widespread disruption of New Jersey solid waste industry. C & D waste is also relatively clean, and does not present significant environmental concerns.[8] Indeed, the only significant impact on others that the Court perceives from granting this relief is requiring disposal facilities in New Jersey to compete with out of state facilities for the disposal of C & D waste, an obligation that is mandated by the Supreme Court's interpretation of the dormant Commerce Clause.

### 4) Remedy

Having found that all four factors favor Atlantic Coast, the Court concludes that Atlantic Coast is entitled to some type of relief. However, the Third Circuit specifically noted that it would "leave it to the discretion of the district court in the first instance ... the issue of the appropriate form of relief if relief is to be granted." 48 F.3d at 718 n. 21. The simplest option would be for the Court to suspend the waste flow regulations with respect to C & D waste insofar as they prevent out of state facilities such as Atlantic Coast from accepting New Jersey waste and disposing of such waste at out of state facilities. New Jersey maintains nondiscriminatory regulations governing both disposal facilities and transfer stations. See N.J.A.C. 7:26–2 (disposal) and 7:26–2B (transfer stations). The Court could simply suspend the operation of the waste flow regulations with respect to C & D waste and allow any industry members, both within and outside the state, to accept such waste so long as they act in accordance with nondiscriminatory New Jersey regulations regarding the processing and disposal of such waste.

Both the state of the current record and important principles of comity counsel against this simplistic approach. While the Court has found that defendants will not suffer significant irreparable harm as a result of the envisioned injunction, it has done so more out of a lack of information than out

of a firm conviction in the accuracy of this statement. For instance, at oral argument, counsel for the county authorities painted a grim picture of what would happen to the county authorities and their outstanding debt obligations if even a small section of the current waste flow regulations were disrupted. The county authorities are public entities that are required to operate at a balanced budget, and their budgets have been calculated on the basis of the revenue from the waste flow regulations. Also, the county authorities may not have access to cash except for their bond reserves, the depletion of which may result in default on the bonds. If even a small portion of the waste flow regulations were disturbed, the county authorities would lose revenues either through loss of business or reduced competitive rates, forcing them to dip into bond reserves. As the reserves neared depletion, the county authorities would be forced to raise their rates to make up for the deficit, causing further lost business to out of state facilities. This downward spiral could eventually result in a default on the multi-millions in outstanding bonds issued by the county authorities.

This scenario has neither been proven on the present state of the record nor does the Court believe that it is certain to result. For example, the county authorities could make up on lost revenues on C & D waste through marginal increases in the tipping fees on non-C & D waste that would remain within the purview of the waste flow regulations. Nonetheless, the Court is mindful that the parties may not have focused on this issue in the current submissions, because they were not aware of what type of remedy the Court envisioned. Therefore, the Court believes that it must consider further information on these issues before it enforces an injunctive scheme that could have possible deleterious effects on both defendants and the public.

Even if convinced that the proposed remedy would not harm defendants and the public, this Court is not the proper institution to develop solutions to New Jersey's waste flow problems. As the Supreme Court has stated,

---

**8.** At oral argument, counsel for the county authorities pointed out that demolition waste resulting from the destruction of older buildings may contain asbestos. Once again, however, the Court has been provided with no proof of what percentage of C & D waste contains hazardous materials or whether Atlantic Coast processes waste that contains such materials.

judges "lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions" in solving these problems. *San Antonio Sch. Dist. v. Rodriguez,* 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). Furthermore, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). As the Court stated in *Jenkins,* "[a]uthorizing and directing local government institutions to devise and implement remedies not only protects the function of those institutions but, to the extent possible, also places the responsibility for solutions to the problems ... upon those who themselves created the problems." *Id. See also Lemon v. Kurtzman,* 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); *Robinson v. Cahill,* 62 N.J. 473, 520–21, 303 A.2d 273 (1973), *cert. denied,* 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975).

Therefore, the Court will grant Atlantic Coast relief conditioned upon the Court's consideration of further input from the parties. The Court shall give the state sixty days to submit a proposed alternative, nondiscriminatory plan to the current waste flow regulations governing the flow of the type of waste within Atlantic Coast's PaDER permit, along with a study of the possible impact of the proposed system on the state and the public. Thirty days thereafter the remaining defendants may submit a study of the possible impact of the proposed alternative regime on them. Thirty days after that Atlantic Coast may submit its objections, if any, to the state's proposed plan, and any arguments in opposition to the defendants' impact studies. The Court will then consider these submissions and fashion appropriate relief.[9]

The Court anticipates two objections from the parties that may be dealt with immediately. First, Atlantic Coast may argue that the state is unlikely to propose a feasible nondiscriminatory alternative to the current scheme. As the Third Circuit observed, the state has apparently "vowed not to abandon its present system until compelled to do so...." 48 F.3d at 718. Therefore, this Court's order could become a self-fulfilling prophecy: the state may propose an alternative regime that would be so detrimental to defendants and the public that the Court could not approve it. However, the Court believes that the state will to the best of its ability live up to its duty to comply with the order of this Court, and that if it does not, scrutiny of the state's proposed plan and the impact thereof by Atlantic Coast's counsel and the Court will allow the Court to implement an effective and feasible remedy.

█ Second, the state has taken the position that due to the interconnected nature of the statutes and regulations making up the waste flow regulations, it cannot effectively change a portion of the regulations without effectively dismantling the entire system. However, the Court notes that the waste flow regulations specifically provide that in an "emergency condition," the Department of Environment Protection and Energy may order the redirection of solid waste. *N.J.A.C.* 7:26–6.7. Certainly a court injunction would constitute such an emergency condition. Therefore, the state has the ability to promulgate emergency regulations that both fulfill the Court's order and that will last until the Court issues a final determination on the merits of the case.

### B. *The Association Plaintiffs*

#### 1) *Likelihood of Success on the Merits*

█ The members of the NSWMA and the WMANJ engage in activities similar to those engaged in by Atlantic Coast, and therefore are equally likely to succeed on the merits of their claim. Defendants do not seriously contest this proposition, but instead argue that the association plaintiffs lack standing. An association has standing to sue if (1) its members would have standing to sue in their own right, (2) the interests the association seeks to protect are germane to its

---

9. The county authorities have argued that the Court should require Atlantic Coast to post a substantial injunctive bond. *See* Fed.R.Civ.P. 65(c); *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 103 (3d Cir.1988). The Court will address this issue when it fashions relief.

purpose, and (3) neither the claim asserted nor the relief requested requires the actual participation of the individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Defendants correctly point out that WMANJ has submitted no evidence regarding its membership, and that the affidavit of Edward Repa, the Director of Environmental Programs for NSWMA, does not name any of its alleged 1,200 members, 130 of which are allegedly within New Jersey, and does not provide a statistical breakdown showing the types or volume of business actually transacted in this state. While the association plaintiffs have failed to provide the Court with this relatively simple and necessary information, it seems clear that WMANJ and NSWMA members from both within and outside would have standing to challenge the waste flow regulations, that the instant suit may further the purposes of the organizations, and that the broad-based injunctive relief sought by the association plaintiffs does not require the participation of any individual member. Indeed, NSWMA has been allowed to participate in similar cases throughout the country. *See, e.g., National Solid Waste Management Ass'n v. Voinovich*, 763 F.Supp. 244 (S.D.Ohio 1991), *rev'd on other grounds*, 959 F.2d 590 (6th Cir.1992). Therefore, the Court finds that the association plaintiffs have shown a likelihood of success on the merits for the purposes of this motion. Defendants may bring any further challenges to the association plaintiffs' standing by formal motion.

### 2) *Irreparable Harm*

The failure of the association plaintiffs to supply the Court with information regarding the financial impact of the New Jersey waste flow regulations on its membership is damaging to their claim of irreparable harm. Although logic might dictate that members would gain revenues and save expenses if not excluded from New Jersey or exposed to the tipping fees associated with the waste flow regulations, it may also be that some of its New Jersey members actually benefit from the current system and would be hurt by its demise. The Court has before it absolutely no evidence regarding the extent of damages caused by the waste flow regulations. Therefore, even if the members cannot recover these damages from the state, they have made no showing as to what degree their damages are "irreparable."

As discussed above, the association plaintiffs have shown "irreparable harm" in that their rights under the dormant Commerce Clause have been violated. Nonetheless, because they have wholly failed to quantify the degree of economic harm they have suffered, the association plaintiffs have made only the most minimal showing of irreparable harm necessary to prevent denial of their request for preliminary injunctive relief.

### 3) *Harm to the Defendants*

As a prerequisite to injunctive relief, the moving party must show that the irreparable harm caused to it by a lack of relief *pendente lite* will outweigh the irreparable harm caused to defendants if such relief is granted. *AT & T*, 42 F.3d at 1427. Because the members of the association plaintiffs deal in all types of solid waste, the relief they seek will require the wholesale suspension of the New Jersey waste flow regulations. Even on a *pendente lite* basis, this could cause a decrease in value and possible default on the county authorities' revenue bonds and the environmental hazards and logistical nightmares envisioned by the state. Where the moving parties' sole showing of irreparable harm consists of a bare violation of rights under the dormant Commerce Clause, a right that does not maintain such an esteemed position in the pantheon of rights as the First Amendment, *see Constructors Association*, 573 F.2d at 820 n. 33, this showing of harm to defendants in itself defeats the association plaintiffs' request for preliminary relief.

### 4) *Harm to the Public*

Although the Court's decision on the previous issue could dispose of this motion, the most compelling reason for denying the association plaintiffs' motion is the degree of harm that the requested relief will cause to

the public.[10] As discussed, the association plaintiffs' request for relief would destroy the entire waste flow regulation scheme on a *pendente lite* basis. While the association plaintiffs argue that this result would benefit the public because it would open New Jersey to outside competition and lower prices in the solid waste disposal industry, the more likely result would be the destruction of a highly complex and integrated waste disposal system and the concomitant destruction of the expectations and economic rights of participants in that system, which has been in place and upheld by the courts for years.

Indeed, perhaps the most disturbing aspect of the association plaintiffs' broad-based request for preliminary relief is that it would upset, rather than maintain, the long-established status quo. The most compelling reason to grant preliminary injunctive relief is to maintain the status quo until a final decision on the merits can be rendered. *Acierno*, 40 F.3d at 647. This injunction would destroy, rather than maintain, the status quo, and injunctive relief is therefore inappropriate in light of the degree to which the irreparable harm currently caused to these plaintiffs is outweighed by the degree of irreparable harm that the injunction could cause defendants and the public.

Furthermore, preliminary injunctive relief suspending the entire waste flow scheme would not only disrupt the status quo, but would also give the association plaintiffs all the relief they seek in this case. Courts have long held that preliminary relief should not give the moving party essentially all the relief it seeks on the merits. *See, e.g., Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n. 13 (D.C.Cir.1969). This maxim is especially applicable here. In light of the Third Circuit's holding in *Atlantic Coast*, defendants will be required to meet the "onerous" burden of proving that *no* feasible nondiscriminatory alternatives exist if the current waste flow regulations are to survive. 48 F.3d at 717–18. If the Court granted *pendente lite* relief

now on its perception that defendants are not likely to make this showing, and defendants ultimately did make such a showing, the Court would have enjoined a comprehensive waste flow scheme to which no reasonable alternatives exist. *See Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 813–14 (3d Cir.1989) (" 'judicial intervention before the merits have been finally determined frequently imposes a burden on defendant that ultimately turns out to be unjustified.' ") (quoting 11 Wright & Miller, *Federal Practice & Procedure* § 2947 at 424). Instead of taking such a brash step at this point in the proceedings, the Court will deny the association plaintiffs' request for preliminary relief and give defendants the opportunity to show at a full hearing on the merits that no feasible alternatives exist.

### C. *The Municipal Plaintiffs*

#### 1) *Likelihood of Success on the Merits*

While the underlying merits of the claims by the municipal plaintiffs does not differ significantly from the claims brought by Atlantic Coast and the association plaintiffs, the municipal plaintiffs are unlikely to succeed on their claims because they cannot assert constitutional rights against the state or the county authorities. "Political subdivisions generally are held to lack constitutional rights against the creating state." 13A Wright, Miller & Cooper, *Federal Practice & Procedure* § 3531.11 at 32. This rule applies to claims by municipalities not only against the state, but also against state agencies and other municipal bodies created by the state. *Id.* at n. 53–54.

The Third Circuit has recently recognized this rule, although with the lukewarm endorsement that it is "waning with time." *Amato v. Wilentz*, 952 F.2d 742, 754–55 (3d Cir.1991). Nonetheless, the Court believes that this rule survives under the circumstances presented by this case. The case most often cited for the proposition that mu-

---

**10.** In *AT & T*, the Third Circuit noted that where a moving party has shown both a likelihood of success on the merits and irreparable injury, the public interest will "almost always" favor the grant of injunctive relief. 42 F.3d at 1427 n. 2. However, as will be explained, the extraordinary

degree of public harm that could be caused here takes the case outside that normal rule. Indeed, the *AT & T* court specifically noted that despite this general rule, a district court "should award preliminary injunctive relief only upon weighing all four factors." *Id.*

nicipalities may sue states for constitutional violations is *Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979). *See Amato,* 952 F.2d at 755 (citing *Rogers* ); *Allegheny County Sanitary Auth. v. United States Envtl. Protection Auth.,* 732 F.2d 1167, 1173 n. 3 (3d Cir.1984) (same). In *Rogers,* a municipal school district sued state educational authorities challenging a state policy that required school districts to participate in an otherwise voluntary federal breakfast program. 588 F.2d at 1059. In allowing the municipality to proceed, the Fifth Circuit held that the question of whether a municipality may sue another state entity was not one of standing *per se,* but a "substantive interpretation[ ] of the constitutional provisions involved." *Id.* at 1068. In light of this, the court concluded that the municipality could assert a claim that the congressional enactment limited the state's power to determine what entity could choose whether to participate in the breakfast program. *Id.* at 1070–71.

While the Court agrees with the holding in *Rogers,* it disagrees with the municipal plaintiffs' assertion that the case applies here. As Wright and Miller recognize, *Rogers* is most appropriately interpreted as standing for the proposition that municipalities may bring challenges under federal law to state statutes that regulate the relationship between the state and the municipality. 13A Wright, Miller & Cooper, *Federal Practice & Procedure* § 3531.11 at 33 n. 55. In other words, municipalities may assert claims against the creating state under the Supremacy Clause, but not under other substantive constitutional guarantees.

Third Circuit case law supports this interpretation of *Rogers.* Although *Amato* did not wholeheartedly endorse the rule that municipalities cannot assert constitutional claims against the state, it did note that it

"may remain the law of the land." 952 F.2d at 755. Furthermore, in *Allegheny County,* a case cited favorably by the municipal plaintiffs, the court cited *Rogers* for the proposition that a municipality could sue the creating state in federal court under a federal statute. 732 F.2d at 1173 n. 3. However, the circuit also noted that the district court had properly dismissed the municipality's constitutional claims against the state. *Id.* at n. 2. Finally, a district court within this circuit has recently held that a municipality cannot assert a dormant Commerce Clause claim against its creating state or other municipal entities. *School Dist. of Phila. v. Pennsylvania Milk Mktg. Bd.,* 877 F.Supp. 245, 250 (E.D.Pa.1995). Therefore, the law in this circuit precludes the municipal plaintiffs from asserting their constitutional claims against both the state and the county authorities.[11]

Two of the municipalities have proceeded in the name of their mayor in his official capacities rather than in the names of the municipalities themselves. The Supreme Court has held that where a state statute leaves municipal officials a choice between violating the United States Constitution or taking actions that are "likely to bring their expulsion," they have standing to challenge the constitutionality of state law. *Board of Educ. v. Allen,* 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 1925 n. 5, 20 L.Ed.2d 1060 (1968). Here, however, the mayors do not argue that the state requires them to enforce the waste flow regulations, but that it requires them to participate in the system. In other words, the mayors do not allege that state law requires them to violate the constitutional rights of others, as it did in *Allen,* but that the rights of their towns are violated by state law, rights that the Court has already found do not exist. Under these circumstances, the claims of the mayors in their official capaci-

---

11. The municipal plaintiffs have also argued that they may bring these claims because New Jersey statutes grant municipalities the power to sue and be sued. *See N.J.S.A.* 40A:60–1(b) (boroughs), 40A:61–1(d) (cities), 40A:62–1(c) (towns), *and* 40A:63–1(c) (townships). While courts have considered the empowering statute in deciding whether a municipality may sue another state-

created entity under federal or state statutory law, *see Allegheny County,* 732 F.2d at 1173 n. 3; *City of East Orange v. Palmer,* 47 N.J. 307, 220 A.2d 679 (1966), a state statute that authorizes municipalities to sue and be sued cannot give those municipalities a right to sue for the violation of constitutional protections that they do not enjoy vis-a-vis the creating state.

ties must fail for the same reasons as those of the municipalities themselves.

### 2) *Other Factors*

Because the Court has found that the municipal plaintiffs cannot assert the claims at issue here, they will be dismissed from the remainder of this case for failure to state a claim. *See Reich v. Beharry,* 883 F.2d 239, 240 n. 1 (3d Cir.1989) (affirming sua sponte dismissal for failure to state a claim). However, for record the Court notes that the municipal plaintiffs have failed to meet their burden on the remaining factors governing preliminary relief for primarily the same reasons as the association plaintiffs. To the extent that the municipalities allege that the waste flow regulations have caused them irreparable harm by forcing them to pay more for waste disposal, this claim is extremely speculative. While the municipal plaintiffs have shown that at this moment they could obtain solid waste disposal services at a lower rate than that at which they currently receive them, they have not shown that over the long term, state and county taxes, decreasing landfill capacity, or other contingencies would not bring the cost of municipal waste disposal to current levels or higher. Furthermore, type 10 municipal waste makes up approximately 75% of the solid waste generated in New Jersey, and the equities of harm to the defendants and the public weigh against the grant of the injunction for the same reasons as discussed in conjunction with the association plaintiffs.

### CONCLUSION

Atlantic Coast's motion for preliminary injunctive relief will be conditionally granted, conditioned upon the Court's consideration of an alternative plan to be submitted by the state of New Jersey, a submission by defendants regarding the impact this plan would have on them, and Atlantic Coast's response to these submissions. Because the possible irreparable harm to defendants and the public from the broad injunctive relief requested by the association plaintiffs outweighs these plaintiffs' showing of likelihood of success on the merits and irreparable harm, their motion for preliminary relief will be denied. Because the municipal plaintiffs lack a cause of action against defendants herein, their motion for preliminary relief will be denied and they will be dismissed from the case.