**ATLANTIC COAST DEMOLITION
& RECYCLING, INC., et al.,
Plaintiffs,**

**v.**

**BOARD OF CHOSEN FREEHOLDERS
OF ATLANTIC COUNTY, et al.,
Defendants.**

**Civil Action Nos. 93–2669
(JEI), 94–3244 (JEI).**

United States District Court,
D. New Jersey.

July 15, 1996.

Mesirov Gelman Jaffe Cramer & Jamieson by Mark R. Rosen, Haddonfield, NJ, for Plaintiff Atlantic Coast Demolition & Recycling, Inc.

Steptoe & Johnson by William T. Hassler, Betty Jo Christian, Paul J. Ondrasik, Jr., F. Franklin Amanat, Washington, DC, for Plaintiffs C & A Carbone, Inc., National Solid Waste Management Association, Waste Management Association of New Jersey.

Peter Verniero, Attorney General of New Jersey by Gail M. Lambert, Deputy Attorney General, Stefanie A. Brand, Kevin A. Auer-bacher, Deputy Attorneys General, Andrea M. Silkowitz, Assistant Att'y. Gen., of Counsel, Department of Law and Public Safety, Division of Law, Newark, NJ, for Defendant Robert Shinn, New Jersey Department of Environmental Protection.

Robert G. Millenky, Camden County Counsel, Camden, NJ, for Defendant Board of Chosen Freeholders of Camden County.

Murshell J. Bland, Bergen County Counsel by Barbara H. Parker, Assistant County Counsel, County of Bergen, Hackensack, NJ, for Defendant Bergen County Department of Health Services.

DeCotiis, Fitzpatrick & Gluck by J.S. Lee Cohen, Hackensack, NJ, for Intervenor–Defendants Hudson County Improvement Authority, Mercer County Improvement Authority, Essex County Utilities Authority, and Passaic County Utilities Authority.

Wolff & Samson, P.C. by Gage Andretta, David Samson, Roseland, NJ, for Intervenor–Defendant Camden County Energy Recovery Associates, L.P.

Sinisi, Van Dam, Sproviero & Sokolich by Stephen P. Sinisi, Scott G. Sproviero, Paramus, NJ, for Defendant Bergen County Utilities Authority.

Higgins, Slachetka & Long by Thomas S. Higgins, Joseph J. Slachetka, Laurel Springs, NJ, for Intervenor–Defendant Cape May County Municipal Utilities Authority.

## OPINION

IRENAS, District Judge:

Plaintiffs have brought challenges under the dormant Commerce Clause [1] to portions of the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E–1 to –207, the Solid Waste Utility Control Act, N.J.S.A. 48:13A–1 *et seq.*, and regulations promulgated thereunder, N.J.A.C. 7:26–1.1 *et seq.*, a group of statutes and regulations that the Court shall refer to collectively as the "waste flow regu-

---

1. U.S. Const. art. I, § 8, cl. 3, provides: "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Although the Commerce Clause "thus speaks in terms of powers bestowed upon Congress," courts have "long recognized that it also limits the power of States to erect barriers against interstate trade." *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, 48 F.3d 701, 710 (3d Cir.1995) (internal quotations omitted).

lations."[2] After granting plaintiff Atlantic Coast's motion for a preliminary injunction of waste flow control over construction and demolition ("C & D") waste and giving the parties an opportunity to further develop the record, the Court held a non-jury trial to consider the merits of the complaints filed by plaintiffs. Having reviewed the testimony submitted by all parties, the Court now holds that the defendants have failed to meet their burden of demonstrating that the local purpose behind flow control could not be served as well by available nondiscriminatory means. A permanent injunction against New Jersey's waste flow regulations will be entered, but the effective date of the injunction will be stayed to permit the defendants to review the impact of the injunction and develop alternative arrangements for the management of New Jersey's solid waste.

## I. PROCEDURAL HISTORY

Plaintiffs here come from two consolidated cases, *Atlantic Coast Demolition & Recycling, Inc., v. Board of Chosen Freeholders, et al.,* Civ. No. 93–2669 (JEI) (*"Atlantic Coast"*), and *C & A Carbone, et al. v. Shinn, et al.,* Civ. No. 94–3244 (JEI) (*"Carbone II"*). The *Atlantic Coast* case was filed on June 23, 1993, by Atlantic Coast Demolition & Recycling, Inc. ("Atlantic Coast") against the Commissioner of the New Jersey Department of Environmental Protection and Energy (the "State" or "DEP"), the Board of Chosen Freeholders of Atlantic County, the Atlantic City Utilities Authority, the Board of Chosen Freeholders of Camden County, and the Pollution Control Financing Authority of Camden County. Atlantic Coast brought claims pursuant to the Commerce Clause and 42 U.S.C. § 1983 seeking a declaratory judgment that the solid waste plans identified in N.J.A.C. 7:26–6:5 violate the Commerce Clause of the United States Constitution and an injunction against enforcement of these regulations.

Atlantic Coast moved for a temporary restraining order, and on September 2, 1993, after a period of intensive discovery, the Court held a hearing on the motion. On September 8, 1993, the Court rendered its oral findings of fact and conclusions of law. In light of the Third Circuit's decision in *J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection,* 857 F.2d 913 (3d Cir.1988), the Court concluded that the waste flow regulations should be analyzed under the balancing test articulated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and that the state interest served by the waste flow regulations outweighed any burden on interstate commerce. The Court therefore denied Atlantic Coast's application for a temporary restraining order. On September 10, 1993, the Court granted the motion of the Mercer County Improvement Authority and the Gloucester County Improvement Authority for leave to appear as amicus curiae. On February 28, 1994, with the consent of the parties, the Court entered final judgment in defendants' favor on the basis of its prior findings of fact and conclusions of law.

Plaintiff appealed. In an opinion filed February 16, 1995, the Third Circuit reversed this Court's decision and remanded the case for further proceedings. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 48 F.3d 701 (3d Cir. 1995). The Third Circuit concluded that in light of the Supreme Court's recent decision in *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (*"Carbone I"*), which was decided after this Court's entry of final judgment, New Jersey's waste flow regulations discriminate against interstate commerce and are subject to heightened scrutiny under the dormant Commerce Clause rather than the less strict *Pike* balancing test. 48 F.3d at 713. However, the Circuit also held that it would remand the matter to the district court to determine whether the regulations could be upheld under strict scrutiny. *Id.* at 718. In doing so, the Circuit specifically stated that "Atlantic Coast is free at any time to apply for *pendente lite* relief." *Id.*

Atlantic Coast filed a motion for a preliminary injunction on April 12, 1995. Also on that date, this Court granted the motions of

---

**2.** For a discussion of how New Jersey's waste flow system actually operates, refer to the discussion by the Third Circuit in *Atlantic Coast,* 48 F.3d at 704–708.

Hudson County Improvement Authority, Mercer County Improvement Authority, Essex County Utilities Authority, Passaic County Utilities Authority (the "County Authorities") and Camden County Energy Recovery Associates, L.P., ("CCERA") to intervene as defendants. By order dated May 1, 1995, Cape May County Municipal Utilities Authority ("CMCMUA") was also permitted to intervene in the case.

*Carbone II* was filed on July 11, 1994, and assigned to the Newark vicinage. The case was brought by C & A Carbone, Inc., the National Solid Waste Management Association, and the Waste Management Association of New Jersey (the "association plaintiffs"), and the mayors of Jersey City and Northvale (the "municipal plaintiffs"), against the State, Bergen County Utilities Authority ("BCUA"), Bergen County Health Department, Hudson County Improvement Authority, and officials at these agencies. The case, which raised essentially the same challenges to the New Jersey waste flow regulations as those brought in *Atlantic Coast*, but which sought damages as well as declaratory and injunctive relief, was stayed pending the Third Circuit's decision in *Atlantic Coast*. When that case was remanded, *Carbone II* was transferred to this Court. On April 12, 1995, this Court granted defendants' motion to consolidate the case with *Atlantic Coast*. On April 17, 1995, the association plaintiffs and the municipal plaintiffs in *Carbone II* moved for *pendente lite* relief.

The Court indicated that it would exercise its discretion "to reopen the record for supplementary evidence," 48 F.3d at 718 n. 21, in relation to the motions for a preliminary injunction, but the parties elected to proceed on the basis of the previous record before this Court and the briefs, exhibits, and affidavits submitted in connection with the preliminary injunction motions and defendants' response thereto. The *Carbone II* plaintiffs filed an amended complaint on May 25, 1995, in which they added additional municipal plaintiffs. The Court held oral argument on the motions on June 6, 1995, and issued a conditional preliminary injunction on June 9, 1995, only as to the flow control of C & D waste. *Atlantic Coast,* 893 F.Supp. 301

(D.N.J.1995). The Court concluded that a preliminary injunction banning the entire present waste flow regulatory scheme was not warranted at the time due to the substantial harm such an injunction would cause to the defendants and the public. In its order conditionally granting only plaintiff Atlantic Coast's motion for a preliminary injunction, the Court dismissed the municipal plaintiffs from the case.

The State was given additional time to submit an alternative plan for the control of C & D waste in New Jersey. After the State had submitted such a plan, and all parties had been given an opportunity to comment, the Court held oral argument on November 6, 1995. On November 28, 1995, the Court granted the motion for *pendente lite* relief as to C & D waste and issued a preliminary injunction subject to implementation by the State of the alternative plan for the control of C & D waste. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 909 F.Supp. 229 (D.N.J.1995). The State was given sixty days to implement the plan. The Court also denied plaintiffs' motion for summary judgment, and held that defendants could consider financial concerns as a legitimate local interest in the formulation of an alternative waste disposal system.

On December 11, 1995, the Court granted the motion of the Mayors Task Force to appear as *amicus curiae*. William P. Schuber and Mark Guarino were dismissed as defendants in this consolidated case on December 22, 1995, by stipulation of the parties.

The non-jury trial on the merits took place on May 6, 1996. At the outset, the Court denied plaintiffs' motion for attorney's fees, without prejudice to a later renewal of the motion. Direct testimony was submitted in advance and the parties were given the opportunity to cross-examine witnesses in Court, although no party did so. The parties submitted proposed findings of fact and conclusions of law, as well as pre- and post-trial briefs. Plaintiffs now seek an injunction against the current flow control regulations to the extent these regulations discriminate against interstate commerce.

## II. LEGAL BACKGROUND

### A. The *Carbone* Decision

In *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) ("*Carbone I*"), the Supreme Court held that the waste flow control ordinance of Clarkstown, New York violated the Commerce Clause. The Supreme Court held that, "[d]iscrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Maine's ban on the import of baitfish because Maine had no other way to prevent the spread of parasites and the adulteration of its native fish species)." *Carbone I*, 511 U.S. at ——, 114 S.Ct. at 1683.

The Supreme Court emphasized the need for governments to seek out alternatives which do not discriminate against interstate commerce, and suggested that there are ". . . any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question. The most obvious would be uniform safety regulations enacted without the object to discriminate." *Id.* at ——, 114 S.Ct. at 1683. Under the *Carbone I* standard, arguments about the necessity of maintaining a discriminatory flow control scheme "must be rejected absent the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem." *Id.* at ——, 114 S.Ct. at 1683.

The Supreme Court rejected the argument that waste must be disposed of locally to avoid out-of-state disposal that might be harmful to the environment. Allowing a bias toward local interests for this reason would essentially be an extension of the governmental entity's police power beyond its jurisdictional bounds. *Id.* at ——, 114 S.Ct. at 1683. The Supreme Court also held that by itself, "revenue generation is not a local interest that can justify discrimination against interstate commerce." *Id.* at ——, 114 S.Ct. at 1684. In addition to its brief discussion on

appropriate facts to be addressed in developing waste disposal plans, the Supreme Court opined as to possible alternatives, stating that the "town may subsidize the facility through general taxes or municipal bonds." *Id.* at ——, 114 S.Ct. at 1684.

### B. The Third Circuit Opinions in *Atlantic Coast* and *Harvey & Harvey*

In 1995, the Third Circuit reviewed this Court's opinion denying plaintiff Atlantic Coast's motion for a preliminary injunction. Based on the *Carbone I* decision, the Circuit overruled this Court's earlier opinion, held that the current waste flow laws as implemented discriminate against interstate commerce, and remanded the case to this Court because it was "apparent from the record that the feasibility and effectiveness of alternative measures pose technologically and economically complex issues" which had not been addressed thoroughly by the parties during the earlier proceedings. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, 48 F.3d 701, 718 (3d Cir.1995). In sum, the Third Circuit found:

> Because we conclude that the waste flow regulations discriminate against interstate commerce on their face or in effect, and that they are not protected from dormant Commerce Clause scrutiny under the market participant exception, the only remaining question is whether the regulations can survive the heightened scrutiny test. "[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."

*Atlantic Coast*, 48 F.3d at 717, *quoting, Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). Discussing its *Atlantic Coast* holding in a subsequent case, the Third Circuit concluded: "In interpreting *Carbone*, therefore, *Atlantic Coast* did not consider all flow control ordinances to be *per se* discriminatory (and consequently subject to strict scrutiny analysis).

Instead, we focused on the process, and invalidated a scheme in which the process discriminated against out-of-state facilities." *Harvey & Harvey, Inc. v. County of Chester,* 68 F.3d 788, 801 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1265, 134 L.Ed.2d 213 (1996).

The County Authorities argue, as does BCUA, that *Harvey* demonstrates that the Third Circuit opinion in *Atlantic Coast* should not be read as a determination that New Jersey's system of designating service utility providers to supply solid waste disposal services is inherently discriminatory. Accordingly, the defendant Authorities suggest that "the task this Court faces on remand is to decide if the non-legislatively mandated policy goal of the State to ultimately require in-state self-sufficiency in solid waste disposal, in light of the operative facts, passes the test of strict scrutiny set forth in *Maine v. Taylor.*" *Post–Trial Brief of County Authorities,* at 3–4. On remand, the Court will not consider whether the waste flow control system is or is not discriminatory, on a statewide level or on a district-by-district analysis. The Third Circuit found the system to be discriminatory, and the Court will not revisit the holding.[3] Rather, the Court here must consider (1) whether there are legitimate local purposes addressed by the waste management statutes, and (2) whether these purposes can be served as well by a nondiscriminatory alternative.

### III. FINDINGS OF FACT

The Court hereby adopts the Findings of Fact incorporated in its Opinion issued June 9, 1995, which incorporated by reference its Findings of Fact Numbered One through Twenty–Six of its oral Opinion rendered September 8, 1993, and the Third Circuit's detailed discussion of the New Jersey solid

waste management system and Atlantic Coast's activities. The Court also adopts the factual discussion in its Opinion dated November 28, 1995. Pursuant to Fed.R.Civ.P. 52, the Court makes the following additional findings of fact based on depositions, certifications, affidavits, and exhibits submitted by the parties in conjunction with the non-jury trial held on May 6, 1996. These findings address the purposes behind New Jersey's solid waste management system and the existence of alternatives to the current waste flow system.

### A. Local Purposes Behind the Waste Flow Regulations

1. The purposes behind the current statewide solid waste management system are: (i) assurance of long-term disposal capacity for all waste generated in New Jersey; (ii) support for development of environmentally safe capacity; (iii) promotion of recycling and source reduction; (iv) assistance in the prevention of illegal dumping and the control of illegal facilities; and (v) protection of the fiscal integrity of governmental entities. *See, e.g., Defendant DEP's Exhibits 36, 37, and 39,* Sondermeyer Certs.; *Defendant DEP's Exhibit 69,* United States District Court Mandated Plan and Impact Study (8/8/95) ("Mandated Plan").

### B. The Current System in New Jersey

2. Over the last three decades, New Jersey has developed a system of waste management that brought the State from a crisis situation to one in which waste is disposed of efficiently and with a minimal negative impact on the environment. The Solid Waste Management Act ("SWMA"), N.J.S.A. 13:1E–1 *et seq.,* combined with the provisions of the Solid Waste Utility Control Act, N.J.S.A. 48:13A–1 *et seq.,* established the

---

**3.** The County Authorities argue that the Court could find that the State's policy of self-sufficiency and in-state procurement is not legislatively mandated, and therefore, that the flow control regulations are not *ipso facto* discriminatory. They argue that the regulatory scheme is severable by district, and that the Court could merely require that the State abandon its self-sufficiency policy and allow the districts to hereafter evaluate and select out-of-state processing and disposal services on an equal footing with in-state services.

vices. *See Post–Trial Brief of County Authorities,* at 13. BCUA suggests that if the Court followed the proposed approach, the Bergen County district plan could be upheld as nondiscriminatory. The Court notes that in any alternatives developed by the defendants, it may be that little, if any, change is required in some of the district plans in order to eliminate discrimination against interstate commerce. It will not, however, make such a holding at this time.

comprehensive waste flow control system in place today and evidenced the Legislature's concern over the manner in which the collection, disposal and utilization of solid waste generated within the State was affecting the health, safety and welfare of its citizenry. The Acts constituted an attempt to address these concerns through a systematic and integrated approach to solid waste management. The constitutionality of the system was upheld during its development, and prior to the Supreme Court's holding in *Carbone I*, there was no reason for state officials to believe that the waste management scheme violated either the state or federal Constitution.

3. The SWMA required the development of a statewide solid waste management plan as well as individual plans for each district. N.J.S.A. 13:1E–21. The twenty-two waste management districts in New Jersey developed waste flow plans in accordance with state laws and regulations. New Jersey's system has resulted in the operation of 12 state-of-the-art landfills and 5 energy recovery incinerators. These facilities have been designed to provide suitable capacity into the next century for the solid waste generated within each respective service area. *Defendant DEP's Exhibit 39*, Sondermeyer Cert. (12/3/95) at ¶ 69.

4. Most districts created an authority with the power to acquire, construct, operate, or contract for the operation of facilities for the collection, transportation, processing, recycling, and disposal of solid waste generated within the district in an environmentally sound manner. Among the twenty-two districts, there are eleven utilities authorities, four improvement authorities, two pollution control financing authorities, and five counties with direct control. *Defendant DEP's Exhibit 13*, Gates Cert. at ¶ 4. The authorities typically were granted, transferred, and assigned the rights, title, and interests of the counties in and under any agreements, documents, regulatory orders and/or moneys relating to management of solid waste. The authorities supervise district solid waste systems which include: (i) facilities to process processible waste; (ii) transfer stations to process non-processible waste and other solid waste; (iii) contracts for transportation and disposal of ash residue produced by the facilities at landfills located outside New Jersey; (iv) programs for re-use, recycling, and source reduction of solid waste generated in-district; (v) fuel-quality assurance programs; and/or (vi) programs for collection, recycling, or disposal of household hazardous waste.

5. In conformity with the Legislature's mandate, and in legitimate reliance upon the judicial findings of the lawfulness of the system, the defendants Essex County Utilities Authority, Hudson County Improvement Authority, Mercer County Improvement Authority, and Passaic County Utilities Authority, after substantial public and governmental debate and participation, planned, constructed and put into operation comprehensive and integrated systems and facilities, executed contracts and lawfully incurred debt obligations designed to assure the safe and efficient disposal of solid waste generated in their districts. *County Authorities' Proposed Findings of Fact.*

6. In 1991, the last year for which data are available, New Jersey generators disposed of 7.1 million tons of solid waste. Of this waste, 4.4 million tons were disposed of in-state and 2.7 million tons were disposed of out-of-state after being processed at an in-state facility. *Plaintiffs' Exhibit 21*, NJDEP Solid Waste Management State Plan Update (1993–2002), Executive Summary at 16, 46–47. It is estimated that less than two million tons per year are now exported from New Jersey. *Defendant DEP's Exhibit 39*, Sondermeyer Cert. (12/3/95) at ¶ 69.

7. Due to the State's stringent environmental standards, extensive public hearings, and the need for funding, the creation of state-of-the-art facilities for waste can take up to several years. *Defendant DEP's Exhibit 10*, Ciolek Cert. at ¶ 14; *Defendant DEP's Exhibit 49*, Castner Dep. at 17–19.

8. The development of resource recovery facilities was deemed historically by the State to be of vital importance to its paramount goal of assuring safe and adequate disposal of waste over the long-term, which the private industry had not been able to accomplish. Resource recovery facilities, as used in this context, are essentially electric

power plants fueled by garbage and used to generate electricity for homes, business and industry. *Defendant DEP's Exhibit 1,* Auerbacher Cert., Exhibit K, *I/M/O Resource Recovery Generic Proceeding,* Decision and Order, BPU Dkt. No. 833–236 (2/23/84) (hereinafter referred to as *"RRF Generic Order"*). Such facilities operate most efficiently when they receive a steady stream of waste. *Defendant DEP's Exhibit 39,* Sondermeyer Cert. (12/3/95) at ¶ 54.

9. New Jersey has established recycling goals of 50% of the municipal waste stream and 60% of the total waste stream by December 31, 1995, and it is well on its way to achieving those goals, having recycled over 50% of the total waste stream by December 31, 1993. *Defendant DEP's Exhibit 42,* Watson Cert. at ¶¶ 6–7. An integrated waste management system and fee structure encourages recycling and long-term reduction of waste. *Defendant DEP's Exhibit 42,* Watson Cert. at ¶ 18; *Defendant DEP's Exhibits 61–62,* Watson Dep. at 41:22–43:17, 49:4–53:23; *Defendant DEP's Exhibit 69,* Mandated Plan at 29–39; *Defendant DEP's Exhibit 59,* Sondermeyer Dep. (10/27/95) at 69:10–70:1, 107:17–108:17, and 177:17–178:20.

10. New Jersey's recycling programs have been successful in part because of the predictability of the marketplace and the economic incentives to recycle that exist under flow control since tipping fees are artificially high and it becomes cheaper to recycle a given amount of material rather than to place that same amount of material in solid waste collection containers for collection and disposal as solid waste. *Id.* at ¶¶ 11–17. The recycling industry in New Jersey will face additional challenges if flow control is eliminated because the companies will have to compete for their raw materials with out-of-state disposal systems that can charge rates based on uncoordinated and non-comprehensive environmental policies. *Defendant DEP's Exhibit 42,* Watson Cert. at ¶ 18.

11. A highly integrated system of statutes intended to ensure the fiscal integrity of local authorities provides for fiscal oversight of the authorities through the Division of Local Government Services and the Local Finance Board, both within the Department of Community Affairs. Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A–1 *et seq.;* Local Fiscal Affairs Law, N.J.S.A. 40A:5–1 *et seq.;* Local Budget Law, N.J.S.A. 40A:4–1 *et seq.;* Local Bond Law, N.J.S.A. 40A:2–1 *et seq.;* and, *Defendant DEP's Exhibit 13,* Gates Cert. at ¶¶ 1–2. The regulatory structure in place under New Jersey law provides for public hearings on district plans, as well as a lengthy review process and subsequent DEP approval of the plans. *See* N.J.S.A. 13:1E–9 and rules and regulations implemented pursuant to the statute.

12. The solid waste public debt outstanding in New Jersey as of December 31, 1994, was $1.75 billion, which is the total of 53 separate bonds issued by New Jersey local authorities or counties. *Defendant DEP's Exhibit 26,* Mansmann Cert. at ¶ 2 and Exhibit A. The debt is serviced primarily by using revenues obtained through flow control. This debt estimate is net of and does not include the debt of the New York–New Jersey Port Authority for construction of the Essex County Resource Recovery Facility (approximately $205,000,000 in Consolidated Revenue Bonds). *Id.*

13. Of the New Jersey solid waste debt that remains outstanding, approximately 90% was funded through revenue bonds, approximately 5% was funded through state zero-interest loans, the proceeds of which were authorized to be used for solid waste systems from the Resource Recovery and Solid Waste Disposal Facility Fund established by P.L. 1985, c. 330, and less than 5% was financed as general obligation debt. *Defendant DEP's Exhibit 26,* Mansmann Cert. at ¶ 2 and Exhibit A. The marketability of revenue bonds for solid waste facilities depends on an assured source of processible waste for the facilities. *Defendant CCERA's Exhibit 1,* Karpenski Declaration (12/4/95) at ¶ 4.

14. The bond rating agencies have downgraded the current bond ratings of outstanding issues of the Atlantic County Utilities Authority, Camden County Pollution Control Financing Authority, Mercer County Improvement Authority, Passaic County Utilities Authority, and Warren County Pollution Control Financing Authority due to the uncertainty of the fiscal integrity of those au-

thorities as a result of the issuance of the *Carbone I* decision on May 16, 1994, and the *Atlantic Coast* decision in February of 1995. *Defendant DEP's Exhibit 71,* Moody's *Municipal Credit Report* (May 1995) at 2–3.

15. Over half (56%) of the outstanding solid waste public debt is secured only by the tipping fee revenue stream of the districts, while the balance also is secured by a county guarantee, a county deficiency agreement, or insurance. *Defendant DEP's Exhibit 26,* Mansmann Cert. at ¶ 3. Approximately 34% of the outstanding solid waste public debt is secured by bond insurance. *Id.* at Exhibit A. Less than 10% of the outstanding solid waste public debt is secured by county deficiency or guarantee agreements. *Id.* at ¶ 3. The covenants to bondholders on the outstanding solid waste bond issues require that the authorities' facilities be "open and ready for business." *Defendant DEP's Exhibit 26,* Mansmann Cert. at ¶ 6 and Exhibit B.

16. The fees currently charged by the authorities for disposal of waste in-state include both debt expenses and non-debt fixed expenses. The non-debt costs can be grouped into two categories: environmental programs and fixed utility costs. The former include recycling programs, household hazardous waste collection programs, and landfill improvement and closure costs, while the latter include the general and administrative expenses of the utility authority, such as host community benefits. *Defendant DEP's Exhibit 11,* DeTalvo Cert. at ¶ 6. In the sample group of the Mercer County Improvement Authority, Warren County Pollution Control Financing Authority, Salem County Utilities Authority, and Union County Utilities Authority, the total fixed costs ranged from $17.89 to $26.20 per ton over and above the debt service costs which ranged from $14.07 to $64.64. *Id.* at ¶¶ 6–7.

17. Tipping fees are determined by each authority and require approval by the DEP and the Department of Community Affairs. The average cost of depositing waste in a New Jersey landfill is $75 per ton, the average New Jersey incinerator cost is $90 per ton, and the average New Jersey transfer cost is $111 per ton. The average out-of-state landfill price in the Northeast is $30 to $50 per ton, while the average price of disposal at nearby solid waste facilities is $46 to $90 per ton. The average transportation costs from New Jersey to competing out-of-state facilities is $10 to $20 per ton. *Plaintiffs' Exhibit 73,* Lambert/Brand Letter at ¶¶ (v), (w) and (y); *Defendant DEP's Exhibit 69,* NJDEP Mandated Plan at 24–25, 37, 50–52 (Tables 3, 6, 7 and 11); *Plaintiffs' Exhibit 80,* Lambert Letter at Attachment 1. It is estimated that New Jersey waste generators spend an average of $110 million per year in excess tipping fees, compared to competitive market prices, due to flow control. *Plaintiffs' Prefiled Testimony,* Exhibit 3, Addendum to Expert Witness Testimony of Joel Cooper (March 5, 1995) at ¶¶ 4–5.

18. Three New Jersey counties, Burlington, Middlesex, and Ocean, currently have tipping fees of less than $45 per ton. Four other counties, Cumberland, Monmouth, Salem, and Union, have tipping fees of less than $70 per ton. Seven counties, Atlantic, Bergen, Hunterdon, Mercer, Morris, Passaic, and Somerset, currently export their waste for out-of-state disposal. *Plaintiffs' Exhibit 9C,* Map of Disposal Method by County.

19. New Jersey's geography raises unique environmental concerns to be addressed in making solid waste management decisions. For example, 50% of the land in Cape May County is designated as the Pinelands Protection Area or the Pinelands National Reserve, and the county has extensive beaches. In addition, the county has a variable population ranging from 95,000 in the off-season to 650,000 in the summer. These characteristics limit the ability of market forces to provide proper solid waste services to the county. *CMCMUA Proposed Findings of Fact.*

## C. Feasibility of Nondiscriminatory Alternatives

### (a) Elimination of the Current Flow Control Regulations

20. An outright ban of the current flow control regulations without immediate implementation of a new, comprehensive waste management system would have disastrous effects on New Jersey. The decreasing vol-

ume of waste caused by increasing competition would result in an escalating tipping fee at disposal facilities, as these facilities attempted to satisfy revenue requirements. Rising prices would result in further decreases of volume with concomitant increases in prices. This price phenomenon has been referred to as the "death spiral." *Defendant DEP's Exhibit 66,* Winkler Expert Witness Testimony at 12. *See also Defendant DEP's Exhibit 11,* DeTalvo Cert. at ¶ 5. The decreased tipping fees could lead to operating deficits. *Defendant DEP's Exhibit 11,* DeTalvo Cert. at ¶¶ 6–7; *Defendant DEP's Exhibit 54,* Mansmann Dep. (1/19/96) at 129:14–25. Current outstanding solid waste public debt issues would be at substantial risk of default. *Defendant DEP's Exhibit 26,* Mansmann Cert. at ¶¶ 6–10 and Exhibits B–D. A default of any of the outstanding solid waste public debt issues might have negative impacts on the bond ratings of all government entities in New Jersey. *Id.* at ¶ 4.[4] Authorities which dispose of their district's waste at out-of-district facilities might not be able to meet their contractual waste delivery obligations to designated disposal sites. *County Authorities' Proposed Findings of Fact,* at 27.

21. It is clear that if the waste flow system were changed to make it nondiscriminatory from a Commerce Clause perspective, the change could not be carried out simply by ending the flow control regulations. The current system represents a delicate balance—a political compromise—which resolves interests that may at times be compatible and at other times conflicting, such as (i) cost to the public for waste disposal, (ii) protection of the environment from damage by waste disposal activities, (iii) funding for ancillary activities, (iv) the need for recycling, (v) the long-term availability of disposal facilities, (vi) protection of neighborhoods in which disposal facilities are located, and (vii) protection of the rights of investors who fund the construction of disposal facilities. This list by no means exhausts the variety of interests which must be balanced in developing a waste disposal system for New Jersey. Introducing out-of-state disposal facilities to

the mix will require formidable planning, political acumen, and legislative and executive resolve.

**(b) Financing Alternatives**

22. A ruling that New Jersey's system of flow control impermissibly discriminates against interstate commerce because there are feasible nondiscriminatory alternatives does not indicate that all systems of flow control are *per se* invalid. *Harvey & Harvey, Inc.,* 68 F.3d at 801. The Third Circuit has stated that while statutes which concentrate waste-hauling, processing or disposal business in the hands of a single or limited set of in-state providers are suspect from a dormant Commerce Clause perspective, *id.* at 798, the fact that the designated sites are in-state does not, standing alone, establish that the flow control scheme discriminates against interstate commerce. *Id.*

23. There are a number of alternatives to the current waste flow regulations which may be used to support or underwrite solid waste services. The counties or the State may issue new bonds to replace those currently used to finance the flow control structure. N.J.S.A. 40A:5A–19; *Defendant DEP's Exhibit 65,* Gates Cert.; *Defendant DEP's Exhibit 66,* Winkler Expert Witness Testimony at 12. Or, as suggested by the Bergen County Utility Authority, the authorities could implement "user charges." *Plaintiffs' Exhibit 2,* BCUA Response to the August 8 State Plan; *Plaintiffs' Exhibit 3,* BCUA's Reply to Plaintiffs' Response to August 8 State Plan. Similarly, a "system benefit charge" could be implemented to make up for funds lost by a cessation of flow control. *Plaintiffs' Exhibit 4,* County Authorities' Response to August 8 State Plan. New Jersey could issue a statewide solid waste special assessment imposed as a tax on all solid waste generated in-state irrespective of its ultimate disposal in interstate commerce. *Defendant DEP's Exhibit 55,* Parker Dep. at 90:6–91:6, 103:13–22, and 248:1–6. A municipality could select the disposal facility to which it will send its solid waste and establish a long-term contract for disposal services. *See Defendant DEP's Exhibit 55,*

---

**4.** See ¶ 14 *supra.*

Parker Dep. at 158:9–12; *Plaintiffs' Exhibit 1*, EPA Report to Congress (March 1995) at ES–12, 13. An alternative could also be funded through municipal, county, or State general revenues. *See Defendant DEP's Exhibit 26*, Mansmann Cert. at ¶¶ 5, 12, 13, 14, Exhibit E. *Defendant DEP's Exhibit 54*, Mansmann Dep. at 133:8–135:12 and 187:8–188:18.

24. All of these alternatives have political, financial, and legal variables, the interplay of which cannot be predicted by the Court. Indeed, even the most sophisticated predictions will be imperfect at best, and the modification of the waste disposal system will be a time-consuming process in which experience will lead to continued modifications. It is impossible to calculate how the individuals, companies, and governmental entities affected by a new system will respond to any set of new rules which govern their economic relationships. The proper responses for each waste management district will surely vary, just as they do under the current system. Counties with low population density have different problems from high density areas. Counties which already have low disposal costs are clearly better equipped to handle a more competitive environment than those whose fee structure is uncompetitive with other sites. Determining the right combination of alternatives to develop a new system will require extensive planning.

25. Defendants have not even come close to proving that a constitutional, nondiscriminatory alternative cannot address the various interests identified in ¶¶ 1 and 21, *supra*, as well or better than the current flow control regulations. Indeed, defendants have not even attempted to present a feasible nondiscriminatory alternative to the Court, but have merely caricatured each of the tools that may be used in building a new system.[5] The litigation lens has neither magnified nor clarified the true feasibility of alternatives; it has only distorted the available choices. Each party has presented the Court with extreme, and generally cursory, conclusions designed to buttress its litigation posture.

Plaintiffs paint a rosy picture of simple systemic change that will save money in the long-run, while defendants conjure a parade of horribles.

26. The current complex system did not develop spontaneously as an integrated whole. Rather, it emerged piecemeal as the culmination of various legislative, executive and regulatory actions, supported, as well, by favorable judicial decisions. When New Jersey was faced with a waste crisis of monumental proportions, the legislative and executive branches of government rose to the occasion, and developed a framework for waste disposal that it had every right to believe was constitutional, environmentally sound, and effective in providing a long-term solution to intractable problems. The United States Supreme Court has changed the rules of the game since then, and the government must now employ that same skill and energy to develop an alternative which passes constitutional muster. A new system cannot be cut of whole cloth but will require legislative, executive, and judicial deliberation over the course of many years.

27. The costs of implementing a nondiscriminatory alternative cannot be identified with precision. *See Defendant DEP's Exhibit 57*, Poole Dep. at 27, 31, and 34–35 (estimating that overall cost of solid waste financing over the next two decades would change, on a "cash flow" basis, from $2.60 billion under the existing bonds to $2.64 billion under so-called refunding bonds, an increase of less than 1.7% of the cost of the current bonds issued under flow control), *compared to Defendant DEP's Exhibit 66*, Winkler Expert Witness Testimony at 11–13 (concluding that four of the five authorities surveyed would lose, on a net present value basis, in excess of $39.0 million if current waste flow bonds were refunded). Nor will the pain inflicted by change necessarily be evenly spread. When the economic ground rules change there are winners and losers. It is hoped that the political process will attempt to fairly distribute any economic pain caused by the change.

---

5. The Third Circuit recognized what has been obvious throughout this litigation: "New Jersey has vowed not to abandon its present system until compelled to do so." *Atlantic Coast*, 48 F.3d at 718.

28. In analyzing the effect of dismantling the current flow control regulations, the Court is not convinced that the change will increase the overall cost of waste disposal for the citizens of New Jersey. It would seem that the availability of out-of-state disposal facilities coupled with some intrastate competition will reduce rather than increase the costs of waste disposal, even if the modified system is developed in a manner consistent with the State's expressed goals.[6]

29. It is not the role of the judiciary to redesign New Jersey's waste management and disposal system. If ever there was a responsibility that belongs to the other branches of government, this is it. Modifying the system to guarantee that it is cost effective and environmentally sound, while offering protection to those who properly relied on the existing waste flow regulations, requires a delicate balancing act properly left to the political process. The judiciary's role must be limited to determining whether any new proposal is constitutional.

### (c) Recordkeeping

30. Recordkeeping by private industry regarding solid waste prior to its disposal in interstate commerce historically has been inaccurate and has not provided the State with sufficient information to plan properly for waste disposal and to ensure the waste is disposed of in a manner that is consistent with federal law and does not cause harm to the environment.

31. While defendants have identified difficulties with maintaining adequate records from private industry, they have not established that laws or regulations could not be implemented to provide for better recordkeeping mechanisms.

### (d) Environmental and Enforcement Concerns

32. Municipalities are potentially liable for remediation costs if they generate or arrange for the disposal of municipal solid waste at solid waste landfills that become designated as Superfund sites under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 *U.S.C.* §§ 9601 *et seq.*

33. According to the United States Environmental Protection Agency, as reported to Congress: "[r]egardless of whether State or local governments administer flow control programs, States are required to implement and enforce federally approved regulations that fully protect human health and the environment. Accordingly, there are no empirical data showing that flow control provides more or less protection." *Plaintiffs' Exhibit 1*, EPA, Report to Congress at II–5 (March 1995).

34. New Jersey has operated under the assumption that solid waste flow directives may serve to reduce the potential risk of CERCLA liability through designation of disposal facilities which possess state-of-the-art environmental controls. *Defendant DEP's Exhibit 9*, Castner Cert. at ¶ 8. It has been the policy of the DEP to try to avoid or reduce future Superfund liability for New Jersey municipalities and businesses by avoiding the disposal of solid waste at facilities which lack fundamental environmental controls such as liners and leachate collection systems. *Defendant DEP's Exhibit 49*, Castner Dep. at 40:2–41:15.

35. The State does not believe, however, that there is a greater risk of future liability to New Jersey generators of waste arising from out-of-state disposal at out-of-state landfills which may be "grandfathered" from compliance with the subtitle D standards of the Resource Conservation Recovery Act, 42 U.S.C. §§ 6941–6949a, rather than in-state facilities, because all of the major facilities in close proximity to New Jersey's borders meet these standards. *Defendant DEP's Exhibit 60*, Sondermeyer Dep. (12/28/95) at 329–331.

36. The cessation of flow control will not interfere with New Jersey's efforts to close dumps and unsafe landfills, as the State has already largely accomplished that objective. *Defendant DEP's Exhibit 60*, Sondermeyer Deposition (12/28/95) at 258–59, 369.

---

**6.** Certainly many elected municipal officials believed this to be the case, as evidenced by their decision to join their municipalities as plaintiffs in this litigation.

37. New Jersey could supplement its laws to require recycling or source separation of materials created in-state or to provide other financial incentives to those who do so voluntarily, in order to encourage privatization of the recycling industry. *See,* N.J.S.A. 13:1E–92 *et seq.* (Clean Communities and Recycling Act); N.J.S.A. 13:1E–99.11 *et seq.* (New Jersey Statewide Mandatory Source Separation and Recycling Act).

38. In their current form of operation, facilities limit the flow of toxic constituents in the waste stream brought to incinerators and ensure continued operation within environmental permit parameters. Absent any control over the flow of waste, these secondary collection systems at facilities cannot be carried out in their current form. *Defendant DEP's Exhibit 39,* Sondermeyer Cert. (12/3/95) at ¶¶ 56 and 67; *Defendant DEP's Exhibit 7,* Callahan Cert. (12/4/95) at ¶¶ 8 and 15. New Jersey's toxicity reduction and recycling programs are funded through taxes on solid waste brought for disposal or through the user fees paid at disposal facilities in the state. *Defendant DEP's Exhibit 60,* Sondermeyer Dep. (12/28/95) at 187:1–196:5.

#### (e) Weighing and Monitoring

39. The actual volume of waste generated in New Jersey will not increase due to an injunction against flow control. However, permitting generators a wider choice of disposal sites may increase the total number of miles travelled by trucks carrying waste. This increase may create not only additional noise, odor and air pollution, but more wear and tear on the State's road system.

40. Although the State argues that only flow control can deal with this problem, the current system permits route control as part of the process of approving transfer stations and other disposal sites. *See, e.g.,* N.J.A.C. 7:26–3.4(j). There is no reason the defendants cannot adopt additional neutral rules regulating truck routes for waste transporters using the State's thoroughfares. New Jersey could (i) provide for expanded route control for the movement of waste whether in-state or out-of-state, (ii) adopt special licensing and inspection provisions for vehicles carrying waste, and (iii) increase enforcement measures, as other states have done. For example, in 1989, Pennsylvania instituted "Operation Trashnet" in response to traffic accidents that had been occurring with garbage trucks driving through the State. Under Operation Trashnet, the State Police set up checkpoints on Routes 80 and 78 and began intensive inspections of solid waste vehicles. Many vehicles from New Jersey were turned back at the border. *Defendant DEP's Exhibit 39,* Sondermeyer Cert. (12/3/95) at ¶ 59.

## IV. CONCLUSIONS OF LAW

### A. The Current System

Waste disposal has become a multi-billion dollar industry in the United States, and with the growth in the garbage market has come recognition from the judiciary that "[s]olid waste … is an article of commerce" which merits Commerce Clause protection. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 359, 112 S.Ct. 2019, 2023–24, 119 L.Ed.2d 139 (1992). Whether the business arrangements between New Jersey generators of waste and out-of-state disposal sites are viewed as "sales" of garbage or "purchases" of transportation and disposal services, "the commercial transactions unquestionably have an interstate character." *Id.*

New Jersey has been waging a war against waste for decades and has decided that this war is best fought with its own troops. The goal has been to design a waste management system which does not rely on help from other states. Companies operating in interstate commerce now seek to join the fray. While the State might view Atlantic Coast and the Carbone plaintiffs as foreign mercenaries seeking adventure in the waste war, the Constitution's Commerce Clause does not permit New Jersey to bar enlistment of foreign troops solely because of their alienage.

Alternatives to the current flow control system do exist. The above-market tipping fees that constitute the heart of New Jersey's flow control system are more or less a hidden tax paid by New Jersey residents. The tipping fees are used to cover not only

the debt service of the bonds issued to fund facilities under flow control, but also to cover the fixed costs of operating waste disposal facilities, financing recycling programs and other environmentally friendly recovery projects, and developing long-term disposal plans. Those activities could be financed through upfront taxes, user fees or other charges which do not discriminate against interstate commerce. Even if there are significant costs to implementing the necessary revisions to the current flow control system, nothing in the record suggests that these would be exorbitant or beyond the capabilities of reasonable fundraising alternatives. And, in any case, the threat of some increase in costs cannot negate the constitutional mandate of the dormant Commerce Clause.

## B. Standard of Review

■ The Commerce Clause provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." Art. I, § 8, cl. 3. This clause has long been interpreted to have a "negative" aspect that prohibits States from unjustifiably discriminating against or burdening the interstate flow of commerce. *Oregon Waste Systems, Inc. v. Department of Envtl. Quality*, 511 U.S. 93, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). If a state law discriminates against interstate commerce by benefitting in-state economic interests at the expense of out-of-state interests, it is subject to heightened scrutiny by the courts.

■ When a court applies a heightened scrutiny analysis to a state law that has been challenged as unconstitutional, it is the defendants' burden to establish that there are no feasible nondiscriminatory alternatives to meet the legitimate state purposes. Because the Third Circuit has already determined that the current New Jersey waste flow regulations discriminate against interstate commerce, the burden is now on the defendants to demonstrate both that those regulations serve legitimate local purposes, and that these purposes cannot be served as well by available nondiscriminatory means. *Atlantic Coast*, 48 F.3d at 717, *quoting, Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986).

■ There clearly is a valid local purpose to the flow control regulations. However, the State has not met its burden of demonstrating an absence of feasible nondiscriminatory alternatives. This burden cannot be met by a brief sketch of one potential alternative, followed by its summary rejection. The defendants must compare the flow control regulations with alternative, comprehensive plans. In its submissions to the Court, the State does not attempt to develop a comprehensive, cohesive plan using the wide variety of political and financial tools available to it. Rather, the defendants have looked at a series of one-dimensional alternatives in isolation and only attempted to prove that no one technique (e.g., system benefit charges, user fees, new taxes, refunding bonds, county or state assumption of debt) can possibly do the job. These isolated distortions do not constitute a fair and adequate attempt at evaluating available alternatives. A simple statement that there are no alternatives to the current system, and that all other plans are at best "damage control," will not suffice to meet defendants' burden of proof.

## C. Legitimate Local Interests

■ Traditionally, courts have upheld state statutes affecting interstate commerce which address public health, transportation safety, and environmental concerns. *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978). *See also Chambers Medical Technologies of South Carolina, Inc. v. Bryant*, 52 F.3d 1252, 1261 (4th Cir.1995), *citing Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978). On the other hand, if measures are passed ostensibly to support the health or safety of the citizenry, but in fact constitute protectionism by the legislating state, the purpose is invalid. *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 399 (3d Cir.1987) ("the Commerce Clause is designed to eliminate protectionist restrictions on interstate trade which typically characterize international trade, such as embargoes, quotas, and tariffs"). *See also New Energy Co. v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). In addition, while the Supreme

Court has held that financial issues alone cannot justify a statute, *Carbone I*, 511 U.S. at ——, 114 S.Ct. at 1684 ("[b]y itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce"), the Court finds that a government must be allowed to consider the cost of available alternatives. An option accompanied by an exorbitant price-tag might legitimately be deemed infeasible.

The State summarized its purposes behind the waste flow regulations as: (i) assurance of long-term disposal capacity for all waste generated in New Jersey; (ii) support for development of environmentally safe capacity, including resource recovery facilities; (iii) promotion of recycling and source reduction; (iv) assistance in the prevention of illegal dumping and the control of illegal facilities; and (v) protection of the fiscal integrity of governmental entities. Similar goals have been cited in support of other state actions, and have been upheld by the courts. *See, e.g., Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 343, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992). The Court finds that "there is little reason . . . to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a '*post hoc* rationalization,'" *Maine v. Taylor,* 477 U.S. 131, 149, 106 S.Ct. 2440, 2453, 91 L.Ed.2d 110 (1986), *citing Hughes v. Oklahoma,* 441 U.S. 322, 338, n. 20, 99 S.Ct. 1727, 1737, n. 20, 60 L.Ed.2d 250 (1979), and therefore, it concludes that the local interests set forth by defendants are legitimate.

**D. Timeframe of Analysis and Availability of Alternatives**

In considering the feasibility of nondiscriminatory alternatives, the question arises as to the time period in which the Court should conduct its inquiry. The existence of feasible alternatives was a very different matter in the 1970s, when New Jersey began developing its waste flow system, than it is today. The Court recognizes that New Jersey, a densely populated and ecologically sensitive state, may be unique in the magnitude of its waste problem and in the comprehensiveness of its remedy, and that its problems are not comparable to those in other parts of the country. The Court also recognizes that the solid waste system has been challenged in the past and has been upheld, causing legitimate reliance on the system.

In *Maine v. Taylor,* the Supreme Court considered whether there were nondiscriminatory alternatives to the Maine statute prohibiting the importation of baitfish. The Supreme Court concluded that the

"abstract possibility" . . . of developing acceptable testing procedures, particularly when there is no assurance as to their effectiveness, does not make those procedures an "[a]vailabl[e] . . . nondiscriminatory alternativ[e]," *Hunt,* 432 U.S., at 353 [97 S.Ct., at 2446], for purposes of the Commerce Clause. A State must make reasonable efforts to avoid restraining the free flow of commerce across its borders, but it is not required to develop new and unproven means of protection at an uncertain cost.

*Maine,* 477 U.S. at 147, 106 S.Ct. at 2452. The Court Supreme continued: "if and when [scientifically acceptable] procedures are developed, Maine no longer may be able to justify its import ban." *Id.*

This language suggests to the Court that it must consider the available alternatives in existence at the time the constitutional challenge is raised. The analysis, however, must be informed by the twenty-five year history of New Jersey's development of the waste flow regulations in its struggle to address public crises and strive for environmentally sound waste management. The defendants relied on judicial holdings that their system was legal, and this reliance was reasonable, at least through the issuance of the *Carbone I* decision. For purposes of injunctive relief the Court will consider alternatives in existence today, but it will not award damages against public bodies or officials, who reasonably believed that the waste control system was constitutional.[7] The Court must now consider

---

7. To the extent that the *Carbone II* plaintiffs would still argue for damages, the Court finds the argument does not merit a discussion. First, there has been insufficient proof as to damages. Second, it appears that a recovery against the State defendant is barred by the Eleventh

whether defendants have proven that there are no nondiscriminatory alternatives available to meet their legitimate local interests.

### E. Existence of Nondiscriminatory Alternatives

Defendants argue that the nondiscriminatory alternatives of implementing a "user fee" or a "systems benefits charge" are not available because their constitutionality is uncertain under New Jersey law. Similarly, defendants suggest that the refunding of bonds is not truly feasible because such an undertaking has never been carried out in New Jersey. To make a finding of feasibility, the defendants would have the Court analyze the amount of political support behind a particular alternative, the legislative climate in the New Jersey Legislature, and other political ramifications. Indeed, defendant Camden County Energy Recovery Authority asks the Court to take judicial notice that "it is highly unlikely that elected officials at the State or local level will pass revenue measures that do more than the bare minimum, i.e., pay for debt service" such that "the other costs involved in the salutary State programs to develop capacity, close landfills, promote recycling and help police the solid waste industry could well be the victims of political pressure to keep the disposal costs down at the expense of the long term public interest." *Post–Trial Brief of Camden County Energy Recovery Associations* at 13–14.

When the Supreme Court established the standard of analyzing alternatives, it was dealing with a quantifiable variable—available scientific knowledge. *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. at 2443. The Supreme Court has never suggested that the availability of a feasible alternative should somehow depend on a court's speculation about a state's political climate or its political will to implement an otherwise feasible plan. Indeed, the Constitution is in many ways intended to resist popular mandates, not to be ruled by them. Defendants suggest that the alternatives are "entirely speculative"

and, as such, do not "make those procedures an available non-discriminatory alternative." *Maine v. Taylor,* 477 U.S. at 147, 106 S.Ct. at 2452, *quoting Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). Most of the arguments espoused by the defendants, however, derive not from the lack of a feasible nondiscriminatory alternative, but from an assumption that New Jersey lacks the political willpower to do the job.

Many years ago New Jersey rose to meet a challenge posed by a soaring flow of waste, and the political will was found to create a complex system of which the State can be proud. The present challenge has been presented not by more garbage, but by the Supreme Court of the United States. Meeting this challenge is feasible and may even be desirable.

A review of case law suggests to the Court that its analysis of feasibility should center upon what is "constitutionally permissible" rather than what is "politically palatable." *See, e.g., Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 345, 112 S.Ct. 2009, 2015–16, 119 L.Ed.2d 121 (1992) (citing as options a per-ton additional fee on all hazardous waste, a per-mile tax on all vehicles transporting hazardous waste across the state, or a cap on the total tonnage landfilled at sites); *SDDS, Inc. v. State of South Dakota,* 47 F.3d 263, 272 (8th Cir. 1995) (in reviewing constitutional challenge to referendum, court found that nondiscriminatory alternatives exist because state could have held a different type of legislative discussion); *Chambers Medical Technologies of South Carolina, Inc. v. Bryant,* 52 F.3d 1252 (4th Cir.1995) (listing examples of nondiscriminatory alternatives without elaboration, including establishment of additional parking facilities, regulation of containers used in transport, and imposition of more stringent incineration requirements). The Supreme Court has stated that a "marginal loss in convenience would not constitute the kind of serious health and safety concern that we have sometimes found sufficient to justify

Amendment, as noted by the Court in its Opinion of June 9, 1995. *Atlantic Coast,* 893 F.Supp. at 309.

discriminatory state legislation." *Kraft General Foods, Inc. v. Iowa Dept. of Revenue and Finance,* 505 U.S. 71, 84, 112 S.Ct. 2365, 2373, 120 L.Ed.2d 59 (1992).

### 1. Financing an Alternative

There is no doubt that flow control has been a crucial tool in maintaining the revenues necessary to finance the current system. Notwithstanding this Court's injunction, it is possible that a modified version of flow control could be developed if it were based not on mandatory direction of in-state waste to in-state facilities, but rather, upon long-term contracts between disposal facilities and waste generators. *See Harvey & Harvey,* 68 F.3d at 808–09, and at 811 (Nygaard, J., dissenting). As long as the disposal site selection process were not biased toward in-state providers, it appears that such a system would not violate the Commerce Clause.

The Supreme Court has recognized that "interstate commerce may be made to 'pay its way.'" *Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality,* 511 U.S. 93, ——, 114 S.Ct. 1345, 1351, 128 L.Ed.2d 13 (1994). There are a variety of ways to garner such payments from participants in interstate commerce, or to otherwise fund waste disposal. For example, it has been suggested that the fiscal integrity of the local solid waste authorities would be protected if the municipalities entered into long-term disposal contracts with the solid waste management district-designated facilities which required the use of that facility. *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *SSC Corp. v. Town of Smithtown,* 66 F.3d 502 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842, *reh'g denied,* —— U.S. ——, 116 S.Ct. 1453, 134 L.Ed.2d 571 (1996).

Given sufficient time and the will to act, the State can amend laws and develop new regulatory structures which will create an environmentally sound waste management system on a cost effective basis while protecting investors and businesses which reasonably relied on the law as it has existed until now.

The cessation of flow control and the unleashing of competitive forces may benefit ultimately rather than injure individual taxpayers. Municipalities have expressed support for an end to flow control, anticipating a decrease in the tipping fee which they currently are required to pay. The entities that pay high tipping fees under flow control surely pass on this cost to consumers. As the competition to provide waste disposal services to New Jersey residents increases, the consumer may see a decline in the fees charged for waste disposal even if some or all of the savings are offset by levies or fees that may be required to fund hazardous waste collection programs, long-term planning, administrative costs, recycling programs, and the like.

### 2. Additional Concerns

A portion of the tipping fee currently charged to dump waste in New Jersey provides revenue for the recycling, resource recovery, and other environmental programs instituted by the State. These costs could be assessed more directly against waste generators in New Jersey through some other means, or another funding mechanism could be found to provide the necessary revenue to support New Jersey's admirable recycling projects.

To meet its other environmental goals, the State can pass additional regulations governing activities of in-state waste generators, regulations which will equally affect in-state and out-of-state disposal facilities. For example, in *National Solid Wastes Management Ass'n v. Meyer,* 63 F.3d 652, 662 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996), the Seventh Circuit suggested that to meet its goals of conserving landfill space and protecting the environment by recycling, the State could require that "all waste entering the State first be treated at a materials recovery facility with the capacity to effect" a separation of recyclables. It may be possible for New Jersey to implement the reverse of such a regulation, that is, one requiring that all waste be treated at a materials recovery facility before disposal, whether it is being deposited in-state or transported out-of-state.

New Jersey's concern about liability for environmental harms that may occur at sites in other states where New Jersey waste is deposited is not supported by the facts. Federal laws require all disposal sites to meet certain criteria, and New Jersey officials have concluded that the major facilities near its borders—where it is most likely that New Jersey waste would be deposited out-of-state—meet federal environmental standards. In addition, New Jersey certainly could develop regulations governing in-state generators' deposit of waste out-of-state, to ensure that the selected out-of-state disposal sites meet federal regulations.

Enforcement and monitoring are largely factors of cost, and New Jersey will be able to meet these goals if it is willing to fund greater efforts in these arenas. Because there are nondiscriminatory alternatives to the present waste flow regulations by which defendants can meet their legitimate local interests, the Court will enjoin defendants from further enforcement of those regulations.

## V. CONCLUSION

The plaintiffs seek to enjoin enforcement of the waste flow control laws in New Jersey. As defendants have failed to prove that the goals of flow control cannot be met adequately by a nondiscriminatory alternative, the Court must conclude that New Jersey's system of flow control of waste violates the Commerce Clause of the United States Constitution.

Many of the arguments made by the defendants derive not from the lack of feasible nondiscriminatory alternatives, but from the fear that political realities will present insurmountable obstacles to effecting change. The Court recognizes the enormity of the task which *Carbone I* and the Third Circuit opinion in *Atlantic Coast* have imposed on New Jersey citizens. To scrap immediately a detailed regulatory plan implemented over the course of decades and relied upon by investors, business people, and political figures would wreak havoc on the financial and environmental well-being of New Jersey citizens. The Court must permit the relevant governmental bodies to develop the specific

nondiscriminatory alternative which they wish to employ, and this development cannot be done overnight. In the past, the State rose to the challenge of developing a comprehensive waste management structure and did so in a manner meriting great praise. The Court does not doubt that given ample time, the State government can again use its ingenuity to create a nondiscriminatory alternative to the current flow control structure.

The preliminary injunction entered by the Court on November 28, 1995, against the enforcement of waste control over C & D waste will be made permanent and will continue to be enforced. In addition, the Court will grant an injunction pursuant to Fed. R.Civ.P. 65 against the enforcement of the waste flow regulations governing the remainder of New Jersey waste. Under the injunction, defendants will not be permitted to enforce the current waste flow regulations to the extent their application discriminates against interstate commerce. This injunction (other than as to C & D waste) will be stayed, however, to give the defendants sufficient time to devise the specific nondiscriminatory alternative which they choose to implement to replace the current flow control regime. The stay will be in place for two years following the date on which this case is no longer subject to the right to appeal, or is no longer pending on appeal or on Petition for Certification to the United States Supreme Court.

An appropriate Order will be issued.

## FINAL JUDGMENT DECLARING NEW JERSEY WASTE FLOW REGULATIONS UNCONSTITUTIONAL, ENJOINING DEFENDANTS FROM ENFORCEMENT OF THE REGULATIONS, MAKING PRELIMINARY INJUNCTION OVER C & D WASTE PERMANENT, STAYING INJUNCTION EXCEPT AS TO C & D WASTE, AND DENYING ALL CLAIMS FOR MONETARY DAMAGES

For the reasons stated in an Opinion issued on even date herewith, **IT IS,** on this 15th day of July, 1996, **ORDERED THAT:**

1.  **FINAL JUDGMENT** is here entered in favor of the Plaintiffs and against the Defendants declaring that those portions of the New Jersey waste flow regulations, as set out in the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E–1 to—207, the Solid Waste Utility Control Act, N.J.S.A. 48:13A–1 *et seq.,* and regulations promulgated thereunder, N.J.A.C. 7:26–1.1 *et seq.,* are unconstitutional to the extent that they discriminate against interstate commerce by operating to deprive out-of-state disposal facilities the opportunity to compete for New Jersey disposal business.

2.  An **INJUNCTION** is hereby entered pursuant to Fed.R.Civ.P. 65 against enforcement of the New Jersey waste flow regulations to the extent these regulations discriminate against interstate commerce as determined in the first decretal paragraph of this Final Judgment.

3.  Pursuant to Fed.R.Civ.P. 62 and the discretion of this Court, the **INJUNCTION** shall be **STAYED** for two years following the date on which this case is no longer subject to a right of appeal, or is no longer pending on appeal or on Petition for Certification to the United States Supreme Court.

4.  The **PRELIMINARY INJUNCTION** governing only flow control of construction and demolition ("C&D") waste in New Jersey, entered by this Court on November 28, 1995, is hereby made **PERMANENT,** and to the extent that the Court's **INJUNCTION** governs C & D waste it shall not be stayed. The Court's Order of November 28, 1995, requiring the plaintiffs to post a bond required by Fed.R.Civ.P. 65(c) is hereby **VACATED.**

5.  **FINAL JUDGMENT** in favor of the Defendants and against the Plaintiffs is hereby entered on all claims for monetary damages.

6.  All applications for counsel fees and costs shall be filed with the court not later than August 12, 1996.